LEE J. VESPER AND ROSE M. VESPER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Vesper v. Commissioner
Docket No. 34666-87
United States Tax Court
T.C. Memo 1989-358; 1989 Tax Ct. Memo LEXIS 357; 57 T.C.M. (CCH) 1035; T.C.M. (RIA) 89358; July 24, 1989
Kenneth R. Hughes and James P. Wersching, for the petitioners. James W. Ruger, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies in petitioners' Federal income tax, additions to tax, and additional *358 interest as follows: Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)
6653(a)(2)
6659
6621(c)
1982
$ 19,399.39
$ 969.97
*
$ 5,748.84 **
1983
19,890.95  994.55  *
5,967.28 **
1984
16,415.99  820.80  *
4,924.79 **
Respondent has conceded the additions to tax under section 6659 for 1982 and 1983. After concessions by both parties, the issues for decision are (1) the fair market value of each of three parcels of land contributed by petitioners to the Village of New Richmond, Ohio, in 1982, 1983, and 1984, and (2) whether petitioners are liable for additions to tax under section 6653(a) for all years and under section 6659 for 1984 and additional interest as set forth above. All section references are to the Internal Revenue Code as amended and in effect for the years in issue. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulated facts *359 are incorporated in our findings by this reference. Petitioners resided in New Richmond, Ohio, when they filed their petition. Petitioners donated 0.302 acres, 0.252 acres, and 0.253 acres of unimproved land to the Village of New Richmond, Ohio, on December 22, 1982, December 2, 1983, and December 13, 1984, respectively. These three parcels of land (the 1982 parcel, the 1983 parcel, and the 1984 parcel, respectively) were adjacent to and became part of the Greenmound Cemetery, a municipal cemetery owned and operated by the Village of New Richmond. In 1983, Lee J. Vesper (petitioner) contributed $ 4,900 to the Village of New Richmond to be used for clearing the donated parcels of land. In the area of the Greenmound Cemetery existing before petitioners' donations (the original area), grave sites were of varying width, although usually 40 inches, and 8 feet in length with 4-foot aisles between the rows of sites. Headstones and footstones were placed in the aisles. When petitioners donated the 1982 parcel, there were an estimated 508 grave sites available for purchase in the original area. At some point after the 1982 contribution, William Hedrick (Hedrick), Superintendent of *360 Cemeteries for the Village of New Richmond, proposed a layout of grave sites for the donated parcels. This proposed layout was approved by the Cemetery Board of the Village of New Richmond. The layout consisted of half-lots measuring 10 feet by 24 feet containing six grave sites. Each grave site was 4 feet by 10 feet, with the headstones being placed within the boundaries of the grave sites. Between the half-lots were 2-foot aisles. The grave sites needed to be 4-feet wide to assure that each site would accommodate a 35-inch wide casket and that each half-lot thus would contain six sites as plotted. As of the time of trial in December 1988, the plotted layout of grave sites for the donated parcels had never been changed. The records maintained by the Cemetery Board show the following sales history of grave sites from 1977 to December 1988. The summary of the sales history is broken down into the number of sales from the original area of the cemetery (original area) and from the area of the cemetery that was donated by petitioners (contributed area). Number of Sales
Number of Sales
Year
Original Area
Contributed Area
Total
1977
23 -0- 23 1978
9  -0- 9  1979
20 -0- 20 1980
4  -0- 4  1981
26 -0- 26 1982
21 -0- 21 1983
54 -0- 54 1984
36 -0- 36 1985
32 19  51 1986
13 4   17 1987
11 6   17 1988
12 * 5   17 Totals
261
34  295
*361 The price of grave sites in the Greenmound Cemetery was set by the Cemetery Board. The considerations for setting the price of grave sites included what the Cemetery Board determined the market would bear. From 1978 until September 1, 1985, the price of grave sites in the Greenmound Cemetery was $ 100. From September 1, 1985, to October 11, 1988, the price was $ 250 for New Richmond residents and $ 325 for nonresidents. On October 11, 1988, the nonresident price was raised to $ 350, but the resident price remained $ 250. Of these prices, $ 50 from each grave site sold was placed in a perpetual maintenance fund. Around the time of the first donation of land, petitioner approached W. Larry Kopf (Kopf), a builder, about appraising the subject property. Petitioner had met Kopf a few years earlier, when Kopf remodeled a house into an office building for petitioner. Petitioner recalled that Kopf's business card had indicated "builder and appraiser." Kopf provided to petitioners letters dated December 16, 1982, February 2, 1984, and January 25, 1985, respectively, *362 as follows: W. Larry Kopf Co. Realtor-Builder-Appraiser Dear Dr. Vesper: Pursuant with your request I have made a personal inspection of the tract of land, together with plat and legal description of same, that you are donating to the Greenmound Cemetery. It is my conclusion that based on the standard cemetery lot, 40 inches wide and 10 feet long, that three tiers of 109 graves each could be put on the tract. This would provide 327 lots. Based on the information supplied, the lots will sell for $ 250 each which includes a 10% ($ 25) perpetual maintenance fee. Therefore, the lots less maintenance will be valued at $ 225.00 each. It is therefore my conclusion that based on the layout with 327 lots at $ 225.00 each, the total value of the lots will be $ 73,575.00. /s/ W. Larry Kopf W. Larry Kopf On their joint Federal income tax returns for 1982, 1983, and 1984, petitioners claimed charitable deductions in connection with the contributions of land based on a value of $ 73,575 per parcel. Petitioners reduced, however, the value claimed for the 1982 parcel to $ 71,825, because several grave sites were set aside for petitioners' personal use. The alleged values were *363 based on Kopf's letters, copies of which were attached to the returns, although petitioner did not believe that those values were correct. Petitioners disclosed on the returns that their cost of each parcel of donated land was $ 367 in 1972. Petitioners also claimed a deduction on their 1983 return for the $ 4,900 cash contribution to the Village of New Richmond for the purpose of clearing the parcels of land. In the notice of deficiency, respondent determined that each of the subject parcels of land had a fair market value of $ 6,000 and adjusted petitioners' charitable deductions accordingly. Respondent allowed in full petitioners' deduction for the $ 4,900 cash contribution. ULTIMATE FINDINGS OF FACT At the time of donation, the fair market value of each parcel was as follows: 1982
$ 10,433
1983
10,783
1984
10,610
OPINION Fair Market Value
There is no dispute in this case that petitioners' gifts of land to the Village of New Richmond were charitable contributions under section 170(a)(1). To determine the allowable deduction, however, we must determine the fair market value of the parcels of land when contributed, to wit, "the price at which *364 the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Section 1.170A-1(c)(2), Income Tax Regs.; Chiu v. Commissioner, 84 T.C. 722, 730 (1985). Petitioners no longer maintain that the fair market value of each parcel was as high as they originally claimed on their returns for the years in issue, and respondent has increased his determination of the value of each parcel since sending the notice of deficiency. Nevertheless, the values of the contributed properties remain the heart of the controversy in this case. The parties relied on the testimony of expert witnesses in presenting their positions to the Court. Respondent's expert was Thomas P. Dwyer (Dwyer), a valuation engineer employed by the Internal Revenue Service since 1978. Dwyer's qualifications included completing various appraisal courses sponsored by the American Institute of Real Estate Appraisers. Petitioners' expert was Timothy S. Hogan, Jr. (Hogan), an appraiser, real estate consultant, developer, and commercial builder. Hogan had lectured at the University of Cincinnati *365 College of Law on Land Use Planning and Zoning. Hogan had been a resident of Clermont County, Ohio, the county in which the subject property is located, since 1946 and had conducted numerous appraisals of real property in New Richmond. In their reports, both expert witnesses concluded that the highest and best use of the subject land was as cemetery property. Further, they both relied on the income approach to determining the fair market value of the land. An appraiser using the income approach views the property in question as would an investor seeking an income-producing property, in this case cemetery property. The estimate of value is based on a projection of gross income and operating expenses, i.e., net income, over a period of time, discounted to present worth by the capitalization process. Hogan valued the 1982, 1983, and 1984 parcels at $ 37,000, $ 35,000, and $ 35,000, respectively. Hogan relied primarily on information obtained from his conversations with Dan Hinson (Hinson), a Cemetery Board member; an article by Julius Finkel and John L. Richards, Jr., entitled Appraisal of Cemeteries in Friedman, Encyclopedia of Real Estate Appraising (3d ed. 1978); various standard *366 appraisal rules promulgated by Federal real estate lending authorities for commercial and residential properties; and his examination of the subject land. In projecting annual gross income per parcel, Hogan first determined an annual sales rate of grave sites per parcel. His determination was based on an analysis of the sale of sites from the 1982 and 1983 parcels between July 1983 and December 1985. According to Hogan, Hinson informed him that 27 sites were sold from the 1982 and 1983 parcels during this 29-month period for a monthly average sales rate of 0.46 sites per parcel, and that 18 of the total 27 sites sold were sold in calendar year 1985 for a monthly average per parcel of 0.75 sites. Adjusting the 1985 rate upward to reflect a "modest growth rate" of 30 percent, Hogan extrapolated an average sales rate of 1.0 site per parcel per month, or 12 grave sites per year. Hogan next determined the retail sales price for each site to be $ 300. Hogan testified that he reached this conclusion based again on a conversation with Hinson. He assumed that grave sites sold for $ 250 to New Richmond residents and $ 350 to nonresidents and that an equal number of sites were sold to residents *367 and nonresidents. Hogan deducted 10 percent from gross income as a "Maintenance Bond," but he did not deduct any additional operating expenses because "without the public subsidy the sales prices would be proportionately higher." Hogan thus computed annual net operating income per parcel to be $ 3,240. Using the mortgage-equity capitalization method, also known as the Ellwood Premise, Hogan computed capitalization rates for the 1982, 1983, and 1984 parcels of approximately 8.6 percent, 9.4 percent, and 9.2 percent, respectively. His capitalization rate for each parcel was based on, among other factors, a hypothetical equity investment of 25 percent and a mortgage term of 25 years, an equity yield rate of 8.5 percent, a projection (holding) period of 7 years, and an appreciation rate during the holding period of 25 percent for the 1982 parcel and 15 percent for the 1983 and 1984 parcels. In his pretrial report prepared and exchanged in accordance with Rule 143(f), Tax Court Rules of Practice and Procedure, Dwyer relied on the income approach in estimating the value of the 1982 parcel at $ 14,500, the 1983 parcel at $ 12,000, and the 1984 parcel at $ 10,500. At trial respondent *368 introduced, without objection by petitioners, a revision of Dwyer's valuations, based on the same method of valuation but on different data relating to his projections of sales per parcel. In his revision, Dwyer concluded that the values of the 1982, 1983, and 1984 parcels were $ 8,500, $ 10,500, and $ 10,500, respectively. In projecting annual net operating income for each parcel, Dwyer first computed a "net price" per grave site of $ 225. Dwyer obtained this figure after examining the prices of grave sites in the New Richmond area, which he determined to approximate $ 250, and deducting a 10 percent ($ 25) perpetual care fee. Dwyer's revised projections of annual sales of sites in the 1982, 1983, and 1984 parcels were 5, 6, and 6 sites, respectively. Dwyer's method involved allocating a portion of the projected number of annual sales for the entire cemetery to each parcel. Dwyer projected annual sales for the entire cemetery based on a 6-year average of sales ending in the year of contribution. The portion of total sales allocated to each parcel was equal to the ratio of the number of sites available for sale in the parcel to the number of sites available in the entire cemetery. *369 Dwyer estimated that the cemetery had 508 available sites before petitioners contributed the first parcel and that, based on the layouts drafted by Hedrick, each parcel had 227 available sites. He projected annual sales as follows: Projected
Available Cemetery Space
Annual Sales
Total
Total
Total
Addition
Total
Percent
Beginning
Yearly
Prior To
-Total
End of
Attributable
Year
of Year
Sales
Addition
Spaces
Year
To Addition
Cemetery
Parcel
1982
-- --
508
227
735 0.309
17
5
1983
735
54
681
227
908 0.250
22
6
1984
908
36
872
227
1099
0.207
27
6
Based on these projections, Dwyer estimated annual net income for the 1982, 1983, and 1984 parcels of $ 1,125, $ 1,350, and $ 1,350, respectively. Finally, Dwyer determined the capitalization rates for the 1982, 1983, and 1984 parcels to be 13.5 percent, 13.0 percent, and 13.0 percent, respectively. Dwyer's rates were based on the average prime rate for the month of contribution, as published in the Federal Reserve Bulletin, plus 2 percentage points to compensate for investment risk. In summary, Hogan and Dwyer used *370 the following factors in estimating the fair market value for each parcel used for cemetery purposes: Hogan
1982
1983
1984
Parcel
Parcel
Parcel
Annual site sales
12 12 12 Price per site
$ 300    $ 300    $ 300    Perpetual care
fee per site  $ (30)   $ (30)   $ (30)   Net annual income
$ 3,240  $ 3,240  $ 3,240  Total sites in
parcel  N/A
N/A
N/A
Projected sales
period (years)  *
*
*
Capitalization
rate (%)  8.6419 9.3728 9.1867 Fair market value
(Net annual income/  capitalization rate)  (Rounded)  $ 37,000 $ 35,000 $ 35,000 Dwyer
1982
1983
1984
Parcel
Parcel
Parcel
Annual site sales
5 6 6 Price per site
$ 250   $ 250    $ 250   Perpetual care
fee per site  $ (25)  $ (25)   $ (25)  Net annual income
$ 1,125 $ 1,350  $ 1,350 Total sites in
parcel  227 227 227 Projected sales
period (years)  45 38 38 Capitalization
rate (%)  13.5 13 13 Fair market value
(Net annual income/  capitalization rate)  (Rounded)  $ 8,500 $ 10,500 $ 10,500 *371 Although expert opinion evidence is obviously admissible and relevant on the question of value, we must weigh such evidence in light of the demonstrated qualifications of the expert and all other evidence of value. Chiu v. Commissioner, 84 T.C. 722, 734 (1985). We are not bound by the opinion of any expert witness when that opinion is contrary to our own judgment. Barry v. United States, 501 F.2d 578 (6th Cir. 1974); Kries' Estate v. Commissioner, 227 F.2d 753, 755 (6th Cir. 1955), affg. a Memorandum Opinion of this Court. We may embrace or reject expert testimony, whichever, in our best judgment, is appropriate. Helvering v. National Grocery Co., 304 U.S. 282 (1938); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court. We may find one expert more persuasive on one element of valuation and another more persuasive on another element. Parker v. Commissioner, 86 T.C. 547, 562 (1986). An expert's resume is less important than the reliability of the factual *372 assumptions and the persuasiveness of the reasoning supporting that expert's opinion. See Rose v. Commissioner, 88 T.C. 386, 417-419 (1987), affd. 868 F.2d 851 (6th Cir. 1989). After evaluating all of the evidence and the opinions of both experts, we are persuaded that Hogan's opinion is fatally flawed and entirely unacceptable. In overview, Hogan has ignored specific facts concerning the property to be valued, has relied heavily on evidence existing only after the dates of contribution, and has reached conclusions that are unrealistic in view of all of the evidence. A grave site in the Greenmound Cemetery was selling for $ 100 at the time of each of the contributions in question. On September 1, 1985, the Cemetery Board raised the price per grave site to $ 250 for a resident and $ 325 for a nonresident. Of these amounts, $ 50 was placed in the perpetual care fund. These prices remained in effect until October 11, 1988, when the price for a nonresident was raised to $ 350. The price for residents remained at $ 250. Hogan estimated the price per site merely by reference to the prices charged for Greenmound Cemetery sites; however, without explanation *373 he applied Greenmound Cemetery prices that were not effective until years after each contribution and that substantially exceeded the price existing at the times of contribution. Hogan's determination that sales to residents and nonresidents were equal was not supported by any objective evidence. Hinson was not called as a witness. Dwyer testified that the Clerk of the Cemetery Board advised him that very few sales were to nonresidents. These unobjected to hearsay statements offset each other, and we are not persuaded that Hogan's assumption was correct. We are also unpersuaded by Hogan's projection of the annual sales of sites per year. First, Hogan again erroneously relied on data that was unavailable at the times of contribution, estimating the number of sales per parcel based on the actual sales from the parcels after contribution. Hogan's estimate of annual sales for all three parcels was predicated on the sales of sites in two of the parcels during 1985, increased by a 30 percent growth rate. Facts relied upon in making a determination of fair market value must have been known or knowable as of the valuation date. Subsequent events or facts may be used to corroborate *374 an appraisal that is based on facts known as of the valuation date. See Estate of Kaplin v. Commissioner , 748 F.2d 1109, 1111 (6th Cir. 1984), revg. a Memorandum Opinion of this Court. Hindsight cannot, however, be the only evidence relied on. Second, the sales data that Hogan relied on was based on oral estimates that did not correspond with the sales history for the Greenmound Cemetery maintained by the Cemetery Board. Third, Hogan's assumed sales rate -- 12 annual sales per parcel for three parcels -- is contrary to the evidence. The sales history for the cemetery, to the extent it exists, for the 12-year period 1977 through November 1988 showed only 3 years in which more than 30 grave sites were sold. Petitioners suggest that the sales records were incomplete. A prospective buyer, however, would be more interested in actual records than in unbridled speculation. Finally, Hogan's capitalization rates, hovering at about 9 percent, are unreasonable. A critical variable in Hogan's computations was the equity return rate of 8.5 percent. Hogan did not explain how he arrived at this equity return rate. This rate is unreasonably low in view of uncontradicted *375 evidence that the prime rate was at least 11 percent on the dates of contribution. Moreover, Hogan's allowance for the appreciation of the properties during the 7-year holding period was based on data regarding the average sales prices of commercial and residential real estate in New Richmond between 1982 and 1988. This data has little if any probative value for purposes of valuing cemetery property. On the other hand, Dwyer's analysis, although not flawless, provides for the most part a reasonable valuation of the parcels. His analysis of net sales price was more expansive than Hogan's; Dwyer considered site prices at cemeteries throughout the New Richmond area, rather than merely those of the Greenmound Cemetery. His estimate of net sales price -- $ 225 -- actually exceeded the retail price of sites in the Greenmound Cemetery at the times of contribution and equaled the net price used by Kopf in his letters. In view of all of the evidence, any estimate in excess of $ 225 would be untenable. Dwyer's methodology for estimating annual sales per parcel based on the ratio of available spaces in each parcel to the available spaces in the entire cemetery is logical. His application *376 of the facts, however, is flawed. Dwyer estimated 227 available spaces in each parcel based on the Cemetery Board's layout of sites for the donated parcels. There is no evidence that such layouts were drafted and available when petitioners contributed the parcels. Respondent contends that the layout for the parcels was consistent with the layout for the original area of the cemetery. The evidence indicates, however, that the usual site in the original area was narrower than that in the parcels, and there is no evidence regarding the arrangement of sites in the original area. Although the quantity of sites per parcel was not a factor used in Hogan's analysis, Hogan testified that, aside from the layout for the donated parcels, a reasonable estimate of sites per parcel was approximately 345. Hogan relied on the Encyclopedia of Real Estate Appraising at page 1047, which states that "Most cemeteries subdivide their land to yield from 250 to 300 four-grave plots, or the equivalent of 1,000 to 1,200 single graves to an acre." While this text has limited application to the subject cemetery property, it is the only reference, available on the dates of contribution, that we have for estimating *377 the number of sites per parcel. Assuming an average of 1,100 sites per acre, and that the donated parcels collectively comprised 0.807 acres, we conclude that fair market value should assume 296 sites per parcel (1,100 sites per acre X 0.807 acres / 3 parcels). Therefore, under Dwyer's methodology the annual sales of sites per parcel are 6.26 sites for the 1982 parcel, 6.23 sites for the 1983 parcel, and 6.13 sites for the 1984 parcel, determined as follows: Projected
Available Cemetery Space
Annual Sales
Total
Total
Total
Addition
Total
Percent
Beginning
Yearly
Prior To
-Total
End of
Attributable
Year
of Year
Sales
Addition
Spaces
Year
To Addition
Cemetery
Parcel
1982
--
--
508 296
804 0.368
17
6.26
1983
804 54
750 296
1046
0.283
22
6.23
1984
1046
36
1010
296
1306
0.227
27
6.13
Dwyer has provided capitalization rates that, unlike Hogan's, assume a yield that would have attracted investors and consider the risks associated with ownership. Petitioners have consistently urged us to refer to the Encyclopedia of Real Estate Appraising on appraising cemeteries. That *378 source states: The capitalization rate is generally no less than the return on government bills and notes or the rate available in other businesses. To this is added a percentage to cover financial and operating responsibilities of cemetery ownership. * * * [Supra at 1049.] Dwyer's estimates more closely comport with this statement. Respondent argues for the first time on brief that, because (1) the experts' appraisals assumed that the donated land was cleared cemetery property, (2) the donated property was not cleared and suitable for cemetery use at the time of each contribution, and (3) petitioners' $ 4,900 cash contribution in 1983 to the Village of New Richmond was earmarked for clearing and improving the property for cemetery use, the amount of the cash contribution must be deducted from the fair market values of the parcels determined for the cleared cemetery property. Respondent further asserts that, because the $ 4,900 was paid in 1983 -- that is, the year of the second contribution and after the first donation -- the amount should be evenly divided in reducing Dwyer's valuations of the 1982 and 1983 parcels. This is the fourth different position asserted *379 by respondent, and the evidence does not indicate whether the experts took these expenses into account in using the income approach. We will not consider this belated argument. We conclude that the fair market values of each parcel as of the date of contribution should be calculated as follows: Annual Sale
Fair
of Sites
Net Price
Annual
Capitalization
Market
Parcel
Per Parcel
Per Site
Net Income
Rate
Value
1982
6.26
$ 225
$ 1,408.50
13.5%
$ 10,433
1983
6.23
225  1,401.75  13.0%
10,783
1984
6.13
225  1,379.25  13.0%
10,610
Additions to Tax and Additional Interest
Section 6653(a) provides for an addition to tax if any part of an underpayment is due to negligence or intentional disregard of rules and regulations. Negligence is defined as a lack of due care of failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 937 (1985). Thus, mere reliance on an appraisal of contributed property will not shield petitioners from the negligence additions; petitioners bear the burden of proving that they exercised due *380 care and were reasonable in their reliance. Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioners have not carried their burden. Petitioners claimed charitable deductions in relation to their donations of land based on valuations of each parcel at $ 73,575. Petitioners maintain that they took careful steps in arriving at the values claimed on their returns. As support, petitioners note that they secured an independent appraisal of each parcel -- i.e., Kopf's letters -- prior to filing their returns. Petitioners also assert that Hogan's valuations -- approximately 50 percent of Kopf's -- demonstrate the absence of negligence on their part. There is no evidence supporting the reasonableness of the values that petitioners claimed on their returns. Kopf did not testify, and we infer that his testimony would not be helpful to petitioners; we do not know what his qualifications were. The only evidence regarding petitioners' understanding of Kopf's qualifications is that Kopf's business card and letterhead listed "appraiser" among his professions. This evidence does not indicate that petitioners reasonably believed Kopf to be an expert. Altogether, Kopf valued the *381 three parcels of land, comprising less than one acre, at more than $ 220,000. His values apparently represented the total sales prices to be realized from the parcels over an indefinite number of years in the future. There was obviously no attempt to discount those proceeds to present value. Petitioners admittedly purchased all three parcels in 1972 for only about $ 1,100. Petitioner testified that he was "amazed" and "surprised" at the values provided by Kopf. Nevertheless, petitioners claimed these exorbitant values in order to claim excessive tax benefits. In light of all of the evidence, we must sustain the imposition of additions to tax under section 6653(a)(1) and (a)(2). Section 6659(a) provides for an addition to tax for an individual who has an underpayment of tax that is attributable to a valuation overstatement. Section 6659(c) defines a valuation overstatement as a value claimed for any property on any return that is 150 percent or more of the amount determined to be the correct value. For this addition to tax to apply, the underpayment for the taxable year attributable to the valuation overstatement must be at least $ 1,000. Section 6659(d). Section 6621(c), *382 which imposes additional interest on substantial underpayments attributable to "tax motivated transactions," characterizes any valuation overstatement within the meaning of section 6659(c) as a tax motivated transaction. Section 6621(c)(3)(A)(i). In regard to the addition to tax under section 6659 for 1984 and the additional interest under section 6621(c) for all years in issue, petitioners argue that there was no valuation overstatement with respect to the donated property. This argument is obviously meritless in view of our conclusions above. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
*. 50 percent of the interest due on the entire deficiencies for the year in issue. ** One hundred twenty percent (120%) of the interest accruing after December 31, 1984, on $ 19,162 for 1982 and the entire deficiencies for 1983 and 1984.↩
*. An additional 9 grave sites in the contributed section were acquired by an exchange for grave sites in the original section.↩
*. A factor in the capitalization rate under the mortgage-equity method.↩