HOMER F. AND DOROTHY L. McMURRAY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McMurray v. Commissioner
Docket No. 4850-90
United States Tax Court
T.C. Memo 1992-27; 1992 Tax Ct. Memo LEXIS 33; 63 T.C.M. (CCH) 1802; T.C.M. (RIA) 92027; January 13, 1992, Filed *33 Decision will be entered under Rule 155. Aline H. Lotter, for petitioners. Charles W. Maurer, Jr., for respondent. TANNENWALD, Judge. TANNENWALD
MEMORANDUM OPINION Respondent determined deficiencies in and additions to petitioners' Federal income tax as follows: Additions To Tax
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1) [1]
6653(a)(2)
6653(a)(1)(A)
1984
$ 65,327
$ 3,266
*
--
1985
53,525
2,676
*
--
1986
85,176
--
--
$ 4,259
Sec.
Sec.
Year
6653(a)(1)(B)
6659
1984
--
$ 19,598
1985
--
16,058
1986
*
25,553
The main issue for decision is the fair market value of land donated by petitioners to the Audubon Society of New Hampshire (Audubon Society). If this issue is resolved *34 in favor of respondent, then the issues involving the applicability of sections 6653(a) and 6659 will have to be decided. In order to avoid unnecessary repetition, we have combined our findings of fact and opinion. Some of the facts have been stipulated and are so found; the stipulation and the accompanying exhibits are incorporated herein by reference. Petitioners are husband and wife and resided in Amherst, New Hampshire, at the time they filed their petition in this case. They timely filed a joint Federal income tax return on a cash basis for each of the years at issue with the Internal Revenue Service Center, Andover, Massachusetts. In 1954, petitioners acquired five parcels of land in the town of Amherst, New Hampshire, including an area known as the Ponemah Bog (bog property). [2] The bog property is located off Route 101A, one of three major roadways carrying traffic in the town of Amherst. Route 101A runs in a westerly direction from Amherst into the town of Milford and in a southeasterly direction into the town of Merrimack and Nashua. *35 In February 1978, the Audubon Society solicited a donation of the bog property from petitioners. Petitioners agreed to contribute the bog property and conveyed their interest therein, as well as their interest in an abutting residential lot, in four separate conveyances taking place in 1979, [3] 1982, and 1985. The following interests were conveyed to the Audubon Society: Year
Lot Number
Description of Property Conveyed
1979
87-2
24.6 acres of bog
1982
87
65% of 47.57 acres of bog
1985
87
35% of 47.57 acres of bog
1985
87-26
1.003-acre residential lot
In the years at issue, Lot 87 was included in the following zones pursuant to the laws of the Town of Amherst, New Hampshire: Residential Zone, Flood Plain Conservation District, and Wetland Conservation District. Lot 87-26 was *36 zoned for residential use. Lots 87-2 and 87 contain a total of approximately 225,000 tons of commercial quality peat, known as Greenwood mucky peat, which is evenly distributed throughout the bog. [4] There are various commercial uses for peat once it is harvested and given adequate time to dry. The most prevalent of these are its use as a source of fuel and its suitability for agricultural purposes. At the time petitioners acquired the bog property, they intended to harvest the peat and sell it commercially. In 1955, petitioners formed the Champion Peat Moss Co., Inc., to harvest and sell the peat. However, petitioners apparently had a change of heart and decided to maintain the bog as a botanical preserve rather than harvesting the peat. Dr. McMurray invested a substantial amount of personal time and effort maintaining the bog, which exceeds 70 acres, in its natural state. Dr. McMurray also started a boardwalk through *37 the property for visitors and constructed a shelter on a piece of abutting dry land. Following the donation of the bog to the Audubon Society, Dr. McMurray continued to help care for the bog. The principal issue in this case is the value of bog property donated by petitioners to the Audubon Society, an exempt organization under section 170. Resolution of this issue turns on the question whether the peat in that property could have been harvested and marketed on a commercial basis under zoning regulations and other pertinent laws existing at the time of contribution. If so, it will then be necessary to decide the value of the peat contained in the bog property contributed in 1982 and 1985. Section 170 allows an individual a deduction for charitable contributions subject to certain percentage limitations and with a carryover of any excess contributions. See sec. 170(b), (d). If a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution. Sec. 1.170A-1(c)(1), Income Tax Regs. Fair market value is "the price at which the property would change hands between a willing buyer *38 and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs.
The fair market value of property as of a given date is a question of fact, and the burden of proof as to this value is on petitioners. Symington v. Commissioner, 87 T.C. 892, 896 (1986). The fair market value of property reflects the highest and best use of the property on the date of valuation. Stanley Works v. Commissioner, 87 T.C. 389, 400 (1986). Determination of the fair market value is not dependent on whether the property is actually being put to its highest and best use. Rather, it is the realistic, objective potential uses to which the property can be put. Id. Respondent maintains that the highest and best use of the bog property is as a natural preserve for conservation purposes. Petitioners do not dispute such highest and best use but maintain that, in valuing the bog property in the conservation use context, the commercial value of the peat contained in the bog should be taken into account. Petitioners submitted evidence of valuation based on appraisals *39 by Patricia Janelle Donovon, Dr. Benno Brenninkmeyer, Dr. Ian A. Worley, and Richard Kasevich. Donovon's appraisals were attached to petitioners' returns for 1982 and 1985. Brenninkmeyer's appraisal estimates the value of peat contained in the bog property. Worley's appraisal calculates the profit potential, on a per-acre basis, of harvesting the peat. Kasevich's appraisal consists of a pro forma income statement designed to show the profitability of a hypothetical harvesting operation on the bog property. We deal first with the Donovon appraisals. In both the 1982 and 1985 appraisals, Donovon predicates value on her determination that the highest and best use of the bog property was as a natural preserve. In respect of the bog property, lot 87, she values the 65-percent interest donated in 1982 at $ 750,000 to $ 800,000, or $ 25,000 to $ 27,000 per acre, [5] the 35-percent interest donated in 1985 at $ 580,000, or $ 35,000 per acre, and the residential lot 87-26, also donated in 1985, at between $ 55,000 and $ 60,000. [6]
*40 Donovon's appraisals are nothing more than a series of conclusions. Scant support is provided for her valuations. For instance, in her 1982 report, she simply states that: "Sales of land tracts have been analyzed and adjusted considering varying characteristics. The appraiser has consulted a wide range of sales information to arrive at an opinion as to the range of fair market value." The report is devoid of any meaningful listing, description, discussion, or other evidence of specific property sales used to support her value of the subject property. We are given no substantive information which would help us ascertain whether comparable residential, commercial, agricultural, or other sales form the basis of her valuation. The conclusory character of the 1982 report is reflected in its preface where Donovon says that it should not be construed as a detailed appraisal. Donovon's 1985 appraisal of the 35-percent interest in lot 87 and residential lot 87-26, although somewhat more detailed than her 1982 appraisal, provides inadequate support for the values provided therein. She bases her appraisal on three sales of residential lots and one listing for a residential lot in the *41 area. She reconciles this approach with her conclusion that the highest and best use of the property is as a natural preserve by stating that "No true comparable sales were located." Compare infra pages 13-14, where the comparables used by respondent's expert are discussed. Even in the context of her own analysis, Donovon's use of her so-called comparables is imprecise, to say the least. [7] Beyond this, in the context of valuing the bog property, Donovon's use of data as to the sale of residential lots suffers from other defects. In the first place, she never mentions or addresses the various prohibitions against development of the land, including residential development, contained in either a Flood Plain Conservation District or a Wetland Conservation District.[8] See infra pages 11-13. Such restrictions are relevant considerations in ascertaining whether the proffered use of the property is reasonable. Stanley Works v. Commissioner, 87 T.C. at 402; see also Great Northern Nekoosa Corp. v. United States, 544 F. Supp. 511 (D. Me. 1982), affd. 711 F.2d 473 (1st Cir. 1983) (legal obstacles to development of power plant *42 on taxpayer's land foreclosed valuation as site for a hydroelectric power plant).
The presence of such restrictions requires petitioners to establish that there was a potential for residential development which was realistic and not remote, speculative, or conjectural. Olson v. United States, 292 U.S. 246, 257 (1933). [9] This they have not done. Indeed, respondent has established that such restrictions were a real impediment, see infra pages 12-13. Consequently, Donovon's so-called comparables are irrelevant insofar as lot 87 is concerned. In the second place, assuming that petitioners could have successfully applied for *43 and obtained a variance permitting residential development of the bog property, Donovon fails to discount the value of the property for additional costs that would necessarily have been incurred to prepare the property for residential development, due to its particular physical characteristics. [10] Thus, even on the basis of an appraisal based on so-called comparable sales of residential lots, Donovon's 1985 appraisal is entitled to little, if any, weight. Petitioners, apparently sensing the inherent weaknesses in Donovon's appraisals, took a different approach to valuation at trial by presenting evidence through their other three experts (Brenninkmeyer, Worley, and Kasevich) as to the value of harvestable peat contained in the bog. Furthermore, in their briefs, petitioners relied on this evidence rather than the Donovon appraisals. Here again, as is the case with *44 Donovon, none of these experts took into account the restrictions imposed on a peat-harvesting operation on the bog property. Nor did petitioners otherwise present any evidence that a variance or permit could have been obtained in respect of such an operation. [11]
The inadequacies of petitioners' presentation stands in sharp contrast to the evidence of value presented by respondent through his expert Joseph G. Fremeau. Fremeau gave considerable attention to the restrictions on the use of the bog property by virtue of the fact that it was located in a Flood Plain Conservation District and/or Wetland Conservation District, and was consequently restricted to the following uses under the laws of the Town of Amherst: Section 4-10 Flood Plain Conservation District
General In the interest of public health, convenience, safety, *45 and welfare, the regulations of this district are intended to guide the use of areas of floodplain subject to flood water, and to encourage the retention of open land so as to constitute an harmonious and appropriate physical development of the Town, as developed from the Master Plan. The specific intent of this District is: 1. To prevent the development of buildings and uses in areas that are unsatisfactory and hazardous due to the threat of flooding. 2. Protection of natural flow and drainage. A. Permitted Uses
1. Any use of the land, which may require a permit, that does not result in the erection of any building, and that is not otherwise regulated by any other provision of the Zoning Ordinance. 2. Those uses that can appropriately and safely be located in the floodplain: a. minor fences, docks, wharves, boat houses, b. agriculture, c. forestry, timbering, tree farming.
3. It is permissible to use areas in the floodplain for recreational purposes such as tennis courts, swimming pools, golf courses, and playing fields. Section 4-11 Wetland Conservation District
In the interest of public health, convenience, safety and welfare, the regulations *46 of this District are intended to guide the use of areas of land with extended periods of high water tables. The specific intent of this District is: 1. To prevent the development of buildings and land use, on naturally occurring wetlands, which would contribute to pollution of surface and ground water. 2. To prevent the destruction of natural wetlands which provide flood protection, recharge of ground water supply, and augmentation of stream flow during dry periods. 3. To prevent unnecessary or excessive expenses to the Town to provide and maintain essential services and utilities which arise because of inharmonious use of wetlands. 4. To encourage those uses that can be appropriately and safely located in wetland area. B. Special Provisions
1. No wetland may be used to satisfy minimum lot requirements in any zone. 2. No septic tank or leach field may be located closer than seventy-five (75) feet to any wetland. 3. No building shall be erected within fifty (50) feet of any wetland.
Furthermore, the laws of the State of New Hampshire reflect additional restrictions on the harvesting of peat or otherwise developing the bog property. Section 483-A:1 of the *47 New Hampshire Revised Statutes Annotated (1988) dealing with wetlands provides as follows: I. No person shall excavate, remove, fill, dredge or construct any structures in or on any bank, flat, marsh, or swamp in and adjacent to any waters of the state without written notice of his intention to construct, excavate, remove, fill or dredge to the wetlands board. * * * At the time of filing with the wetlands board, said person shall also file 3 copies of said notice, with a detailed plan, if a major project, but accompanied with a map showing the exact location of the proposed project with the town or city clerk. The town or city clerk shall forthwith send a copy of the said notice to the selectmen, mayor or city manager, the municipal planning board, if any, and the municipal conservation commission * * *
Section 483-A:1-b of the New Hampshire Revised Statutes Annotated (1988) expresses the public purpose behind the protection of wetlands: Finding of Public Purpose. It is found to be for the public good and welfare of this state to protect and preserve its submerged lands under tidal and fresh waters and its wetlands, (both salt water and freshwater), as herein defined, *48 from despoliation and unregulated alteration, because such despoliation or unregulated alteration will adversely affect the value of such areas as sources of nutrients for finfish, crustacea, shellfish and wildlife of significant value, will damage or destroy habitats and reproduction areas for plants, fish and wildlife of importance, will eliminate, depreciate or obstruct the commerce, recreation and aesthetic enjoyment of the public, will be detrimental to adequate groundwater levels, will adversely affect stream channels and their ability to handle the runoff of waters, will disturb and reduce the natural ability of wetlands to absorb flood waters and silt, thus increasing general flood damage and the silting of open water channels, and will otherwise adversely affect the interests of the general public.
In light of these restrictions and his investigation of the possibilities of obtaining a variance or permit, Fremeau concluded that any request for a permit to harvest the peat contained therein or otherwise develop the bog property would have met with substantial opposition and would have had little chance of success. Fremeau then focused on eight sales of comparable wetland *49 properties that were particularly suitable as natural preserves for conservation purposes, which were sold for that purpose at prices ranging from $ 200 to $ 800 per acre. Fremeau ultimately determined that the bog property, lot 87, had a value of $ 400 per acre or an aggregate of $ 12,500 for the 65-percent interest and $ 6,700 for the 35-percent interest. While we agree with petitioners that the wetland properties selected by Fremeau as comparable sales were not equivalent to the contributed property in all respects, we believe that he located the most comparable properties available at the time for his determination. In any event, petitioners have provided us with no more suitable comparables. As an alternative to valuing the bog property itself, petitioners contend that, assuming there is no possibility of developing the property or harvesting the peat because of restrictions, the State or local government unconstitutionally deprived them of all economic use of their property for which they were entitled to just compensation, and that a claim for such compensation was transferred to the Audubon Society and constitutes the gift which should be valued. In this context, petitioners *50 argue that the economic value of the peat is a significant element in the determination of just compensation. Petitioners' position is seriously flawed. In the first place, the question whether such a claimed regulatory taking can be the subject of just compensation is presently a controversial issue now before the Supreme Court of the United States at least insofar as the U.S. Constitution is concerned. See Lucas v. South Carolina Coastal Council, 404 S.E.2d 895 (S.C. 1991), cert. granted 112 S. Ct. 436 (Nov. 18, 1991). In this connection, we note that, although the Supreme Court of New Hampshire has indicated that the application of zoning ordinances may result in "inverse condemnation" entitling the owner of property to damages, see Burrows v. City of Keene, 432 A.2d 15 (N.H. 1981), explained in Claridge v. New Hampshire Wetlands Bd., 485 A.2d 287 (N.H. 1984), it is by no means clear that such an approach would be applied to the bog property. In the second place, the standards by which compensation (or damages) for such a taking are to be determined are different from the standard for determining fair *51 market value for a charitable contribution. See Great Northern Nekoosa Corp. v. United States, supra.The record herein is totally devoid of any evidence directed toward valuing any such claim. Moreover, we have not been favored with any evidence as to whether such a claim could be the subject matter of a charitable contribution or that it was in fact assigned to the Audubon Society or, alternatively, that it attached to the property and passed to the Society as a matter of law. In light of the foregoing, we conclude that any claim by petitioners to just compensation or damages rests upon such speculative grounds that it should be rejected. Olson v. United States, supra.
We hold that petitioners have failed to carry their burden of proof and that the values of bog property contributed in 1982 and 1985 do not exceed the amounts reflected in Fremeau's valuations. As to lot 87-26, both parties agree that it should be valued as residential property. Fremeau evaluated 20 comparable sales and determined a range of $ 22,533 to $ 58,000 for house lots in the Amherst area. Noting that lot 87-26 is smaller than many of the house lots *52 in Amherst and that it is encumbered by a right-of-way easement owned by the Audubon Society, Fremeau discounted the value of the property slightly and arrived at a $ 35,000 value. Petitioners have not presented sufficient evidence, see supra note 7, which would lead us to conclude that this valuation is incorrect. Additions To Tax
For purposes of section 6653(a), [12] negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances; petitioners bear the burden of proof. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Mere reliance on appraisals of contributed property is not enough to shield petitioners from the negligence additions; petitioners must affirmatively establish that their reliance was reasonable and prudent under the circumstances.[13] Beyond the bare fact that the Donovon appraisals were attached to the 1982 and 1985 returns, we have not been favored with any evidence reflecting petitioners' reliance on them. We would have thought that petitioners would have seen fit to testify on this score in view of the sketchiness of the appraisals (particularly in respect of the *53 1982 contribution) and in view of the abandonment of the appraisals at trial and on brief as support for the valuations now claimed by petitioners. In this connection, we think it is significant that petitioners originally planned a peat-harvesting operation and then abandoned it for reasons left unexplained. Moreover, there is evidence of record indicating that Dr. McMurray was knowledgeable as to the development of real estate in the Amherst area. We conclude that petitioners have not satisfied their burden of proof in respect of the additions to tax under section 6653(a). Section 6659(a) imposes an addition to tax if the amount of any underpayment of $ 1,000 or more is attributable to a valuation overstatement. Section 6659(c), as in effect for *54 the taxable year 1982, provided: SEC. 6659(c). Valuation Overstatement Defined. -- (1) In general. -- For purposes of this section, there is a valuation overstatement if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be). (2) Property must have been acquired within last 5 years. -- This section shall not apply to any property which, as of the close of the taxable year for which there is a valuation overstatement, has been held by the taxpayer for more than 5 years.
Petitioners contend that the carryover charitable contribution deductions claimed on their 1984 and 1985 returns include the 1982 donation of bog property and that they are therefore, under the 1982 version of section 6659(c)(2), exempt from the additions to tax imposed by section 6659 for those years. [14] We do not agree. The exception in section 6659(c)(2) for property held for more than 5 years preceding the date of contribution applied to underpayments with respect to returns due after December 31, 1981, and before January 1, 1985. Economic *55 Recovery Tax Act of 1981, Pub. L. 97-34, sec. 722(a), 95 Stat. 172, 341. Section 6659(c)(2) was repealed in respect of returns filed after December 31, 1984, by the Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 155(c)(1)(A), 98 Stat. 494, 694. [15] However, it is clear that the 5-year limitation does not operate as a modification of the definition of a valuation overstatement contained in section 6659(c)(1). Stanley Works v. Commissioner, 87 T.C. 389, 415-416 (1986). Such being the case, a valuation overstatement from a prior year which is carried over to a later year (in this case an unused portion of the 1982 contribution was carried over to 1984 and 1985) is governed by the law in effect at the time the return for the subsequent year is filed. Neilsen v. Commissioner, 87 T.C. 779 (1986). [16] Accordingly, petitioners are liable for the additions to tax imposed by section 6659 for all of the years at issue. *56 In order to take into account minor adjustments reflected in respondent's brief, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code as amended and in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of the interest due on the deficiency. ↩
2. The formation of bogs supposedly began about 12,500 years ago with the melting back of the continental ice sheet. As the ice melted, smaller blocks of ice broke off and became embedded in the ground. These ice blocks melted over time creating deep "kettle hole" ponds. As the climate warmed, vegetation gradually took hold on the outer edges of the pond. Eventually, the vegetation, which floated over the water's surface, caused the formation of a mat or bog. The mat is comprised primarily of vegetation known as sphagnum (peat) moss. Numerous other types of vegetation are also evident on the bog's surface.↩
3. The 1979 conveyance, although part of the overall plan to donate the Ponemah bog to the Audubon Society, is not at issue in this case. This case is concerned only with the value of land contributed in 1982 and 1985.↩
4. Peat is formed by the gradual dying back of vegetation which grows on the bog's surface.↩
5. Petitioners used a value of $ 26,000 per acre on their 1982 return. ↩
6. Petitioners used a value of $ 57,500 on their 1985 return.↩
7. One so-called comparable is keyed to the bog property, one is keyed to the residential lot, and two are not keyed to either.↩
8. See Garrison v. Commissioner, T.C. Memo. 1986-261↩ (the fact that contributed property located in wetland and flood plain area would have required State and local approval to develop was taken into account by the experts).
9. See also Fiske v. Commissioner, T.C. Memo. 1984-494↩. 10. Cf. Demery v. Commissioner, T.C. Memo. 1981-412↩.
11. In view of this fatal gap in petitioners' case, we need not resolve the disagreement of the parties as to the value of the bog property in terms of its peat-producing potential.↩
12. An addition to tax for negligence is imposed by sec. 6653(a)(1) and (2) for 1984 and 1985 and sec. 6653(a)(1)(A) and (B) for 1986.↩
13. Murphy v. Commissioner, T.C. Memo. 1991-226; Vesper v. Commissioner, T.C. Memo. 1989-358↩.
14. There is no disagreement that the contributed property was in fact held more than 5 years before its contribution to the Audubon Society. ↩
15. Sec. 6659 was repealed in its entirety in respect of returns due after Dec. 31, 1989. Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, sec. 7721(c)(2), 103 Stat. 2106, 2399.↩
16. See Baker v. Commissioner, T.C. Memo. 1990-263↩.