CHARLTON H. BUCKLEY AND SUSAN S. BUCKLEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Buckley v. Commissioner
Docket No. 24934-91
United States Tax Court
T.C. Memo 1994-470; 1994 Tax Ct. Memo LEXIS 478; 68 T.C.M. (CCH) 754; September 26, 1994, Filed *478 Decision will be entered under Rule 155. For petitioners: Bernard P. Kenneally
For respondent: James P. Thurston and Bryce A. Kranzthor. CHIECHI
CHIECHI
MEMORANDUM FINDINGS OF FACT AND OPINION CHIECHI, Judge: Respondent determined the following deficiencies in, additions to, and increased interest on petitioners' Federal income tax: Increased
Additions to Tax
Interest Section
Section 6653 Section Section
Section
Year
Deficiency
[1] 6653(a)(1)(A) (a)(1)(B)
6653(a) 6659(a)
6621(c)
1987
$ 185,155
$ 9,258 *
--  $ 55,545 **
1988
608,648
--  --
$ 30,432
182,594 **
* 50 percent of the interest due on the portion of the underpayment
attributable to negligence. Respondent determined that the entire
underpayment was attributable to negligence.
** Interest at 120 percent of the underpayment rate provided by sec. 6621
on the portion of the deficiency constituting a substantial underpayment
attributable to tax-motivated transactions. Respondent determined that
the entire underpayment was attributable to tax-motivated transactions.
*479 As an alternative to her determination with respect to the additions to tax imposed by section 6659(a), respondent determined that petitioners are liable for the addition to tax imposed by section 6661(a) for a substantial understatement of income tax for each of the years at issue. The issues remaining for decision are: [2]
1. Are petitioners entitled to amortize the amounts allocated by Henry Broadcasting Company (Henry), an S corporation wholly owned by petitioner Charlton H. Buckley (Mr. Buckley), to radio broadcast formats (formats) that were among the assets of certain radio stations (stations) it acquired? We hold that they are to the extent stated herein. *480 2. Are petitioners entitled to amortize the amount allocated by Henry to a studio lease (studio lease) that was among the assets of certain stations it acquired? We hold that they are to the extent stated herein. 3. Are petitioners entitled to amortize the amounts allocated by Henry to transmitter leases that were among the assets of certain stations it acquired? We hold that they are to the extent stated herein. 4. Are petitioners entitled to amortize the amounts allocated by Henry to two covenants not to compete that it entered into with the sellers of certain stations it acquired? We hold that they are to the extent stated herein. 5. Are petitioners liable for the additions to tax for negligence for each of the years at issue? We hold that they are to the extent stated herein. 6. Are petitioners liable for the addition to tax for a valuation overstatement for each of the years at issue? We hold that they are to the extent stated herein. 7. To the extent that respondent's determination with respect to the addition to tax for a valuation overstatement for each year at issue is not sustained, are petitioners liable for the addition to tax for a substantial understatement *481 of income tax for each such year? We hold that they are not. 8. Are petitioners liable for interest at the increased rate provided by section 6621(c) for each of the years at issue? We hold that they are to the extent stated herein. FINDINGS OF FACT Some of the facts have been stipulated and are so found. At the time their petition was filed, petitioners resided in Atherton, California. Mr. Buckley is the sole shareholder and president of Henry, and S corporation. Pursuant to an asset purchase agreement dated July 22, 1986, on October 1, 1986, Henry purchased from Grace Broadcasting Co. (Grace) for $ 3 million substantially all of the assets of radio stations KDON-AM and KDON-FM (sometimes collectively referred to herein as KDON) that were licensed to the city of Salinas, California. As part of the purchase of KDON, Henry and Grace entered into a covenant not to compete (Grace covenant) that stated that Grace agreed, in exchange for $ 2 million, not to compete for three years with Henry in providing commercial radio broadcasting at any location within a 50-mile radius of Salinas. Prior to the purchase of KDON, a media broker furnished Henry with projections of operating *482 profits for both KDON-AM and KDON-FM for 1986, 1987, and 1988 which estimated that the total such profits for those years would be $ 1,465,000. At the time Henry purchased KDON-FM, it was broadcasting a contemporary hit, or top 40, music format. [3]
Pursuant to an asset purchase agreement dated September 30, 1986, on December 22, 1986, Henry purchased from KFAB Broadcasting Co. for $ 21,800,000 substantially all of the assets of radio stations KFAB-AM (KFAB) and KGOR-FM (KGOR) that were licensed to the city of Omaha, Nebraska. At the time of those purchases, KFAB was broadcasting a full service AM format, and KGOR was broadcasting a contemporary hit, or top 40, music format. [4]
*483 Among the assets acquired by Henry when it purchased substantially all of the assets of KFAB and KGOR was a lease for space used as the studios for those stations (studio lease). The lease term had begun on April 1, 1979, and was to end on March 31, 1989. The monthly rent payable under the studio lease was $ 1,800. At the option of the lessee, the studio lease was renewable at a monthly rent of $ 2,100 for two consecutive five-year terms from April 1, 1989 to April 1, 1994, and from April 1, 1994 to April 1, 1999. As part of the negotiations between Henry and the owner of KGOR, on December 22, 1986, Henry entered into a 10-year lease with Lee Enterprises, Inc. (Lee) to rent for $ 100 per month space for the KGOR transmitter and antenna (KGOR transmitter lease) at a site owned by Lee. Under that lease, Henry was permitted to broadcast KGOR's signal from an antenna situated on Lee's television tower in Omaha, Nebraska. The KGOR transmitter lease could be extended, at the lessee's option, for a second 10-year term at a monthly rent of $ 200. Pursuant to an asset purchase agreement dated July 13, 1987 (original agreement), that was modified on November 10, 1987 (modified agreement), *484 on December 1, 1987, Henry purchased from McClatchy Newspapers, Inc. (McClatchy) for $ 5,243,450 substantially all of the assets of radio stations KMJ-AM (KMJ) and KNAX-FM (KNAX) that were licensed to the city of Fresno, California. At the time of those purchases, KMJ was broadcasting a news/talk format, and KNAX was broadcasting a country music format. As part of those purchases, on December 1, 1987, Henry and McClatchy entered into a covenant not to compete (McClatchy covenant) that stated that McClatchy agreed not to become associated for three years in any manner with any radio broadcast station located within 50 miles of Fresno. The original agreement provided that the consideration for the McClatchy covenant was $ 2 million. The modified agreement recited that the consideration for that covenant was $ 1,906,550. McClatchy was a media conglomerate that owned newspapers, including a daily newspaper in Fresno, and radio and television stations. At the time Henry purchased most of the assets of KMJ and KNAX, McClatchy informed Mr. Buckley that it was terminating its involvement in the communications business except with respect to newspapers. Under regulations of the Federal *485 Communications Commission (FCC), [5] McClatchy could not, after the sale of KMJ and KNAX, obtain a license for a broadcast station in Fresno because it published a daily newspaper in that city. McClatchy's sale of those stations terminated a cross-ownership arrangement that had been allowed by the FCC under certain so-called grandfathering rules that it had promulgated. In 1988, at about the time it acquired KFYE-FM, discussed below, Henry sold KNAX in order to buy a station in Fresno with a stronger signal than that of KNAX, which was poor. As part of that sale, Henry entered into a covenant not to compete (Henry covenant) with the buyer of KNAX that stated that Henry agreed, in exchange for $ 1 million, not to broadcast country music in the Fresno market for three years. Pursuant to an asset purchase agreement dated April 28, 1988, on September 30, 1988, Henry purchased from Professional Broadcasting, Inc. for $ 4,350,000 substantially all of the assets of radio station KFYE-FM *486 (KFYE) that was licensed to the city of Fresno, California. Among the assets acquired was a transmitter lease (KFYE transmitter lease) under which Henry was allowed to transmit KFYE's signal from a television broadcast tower. The lease term had begun on November 8, 1979, and that lease was modified on March 15, 1985. At the time Henry purchased KFYE, it was losing money and the adult contemporary broadcast format that it was broadcasting was unsuccessful. Petitioners' returns for the years at issue were prepared by the accounting firm of Johnson, Levie & Lehrman (Johnson, Levie). Henry's returns for the years at issue were prepared by the accounting firm of Miller, Kaplan, Arase & Co. (Miller, Kaplan). Miller, Kaplan, which has extensive experience in the radio broadcast industry, also provided a variety of other services to Henry, including auditing its books and allocating the prices paid for the stations purchased by Henry to various assets acquired and determining the useful lives of those assets. Specifically, shortly after Henry purchased the stations in question, Mr. Buckley and Henry's employees provided Miller, Kaplan with information concerning the assets of those *487 stations, including the prices paid and the purchase agreements. Miller, Kaplan allocated the purchase price for each of those stations among the assets acquired, including the intangible assets at issue. In making those allocations, Miller, Kaplan used methods acceptable under Generally Accepted Accounting Principles (GAAP) that were common in the radio broadcast industry and relied on its extensive compilation of data concerning the radio broadcast industry. Miller, Kaplan also estimated the useful lives of the intangible assets at issue. Miller, Kaplan did not determine the amount to be allocated to the Grace and McClatchy covenants. OPINION Petitioners bear the burden of demonstrating error in respondent's determinations. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Rockwell v. Commissioner, 512 F.2d 882, 885 (9th Cir. 1975), affg. T.C. Memo. 1972-133. Relying on Buffalo Tool & Die Mfg. Co. v. Commissioner, T.C. Memo. 1981-457, petitioners contend that the Court should determine the fair market value of each of the intangible assets at issue *488 based on all the evidence in the record and without regard to the burden of proof. The presence of a valuation issue does not alter the customary rule that the taxpayer bears the burden of proof. Nonetheless, where it appears that property has some value, we will not find against a taxpayer simply because that taxpayer has not demonstrated its precise value. The Court may consider all the evidence in the record in arriving at what it finds to be an appropriate value for the property in question. See Zmuda v. Commissioner, 79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984); Swiss Colony, Inc. v. Commissioner, 52 T.C. 25, 37 (1969), affd. 428 F.2d 49 (7th Cir. 1970); Reisner v. Commissioner, 34 T.C. 1122, 1129-1130 (1960); cf. Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930). In arriving at that determination, however, the Court will weigh its judgment heavily against the taxpayer who is responsible for any deficiencies in the proof required to substantiate the values claimed. See Zmuda v. Commissioner, supra; *489 see also Cohan v. Commissioner, supra at 544. Section 167(a), in general, allows as a depreciation deduction a reasonable allowance for exhaustion, wear, and tear (including a reasonable allowance for obsolescence) of property used in a taxpayer's trade or business. The basis on which depreciation is to be allowed in respect of any property generally is the adjusted basis provided in section 1011 for the purpose of determining gain on the sale or other disposition of such property. Sec. 167(g). The parties do not dispute that the adjusted basis of each of the intangible assets at issue is to be determined under section 1060. Under that section, the purchase price paid by Henry (i.e., the basis) for each station acquired generally is to be allocated among each such station's assets in proportion to the fair market value of each such asset as of the date of purchase. Sec. 1060(a); sec. 1.1060-1T(a)(1), (d), Temporary Income Tax Regs., 53 Fed. Reg. 27039, 27040 (July 18, 1988).[6] The amount of consideration allocated to any particular asset generally may not exceed its fair market value on the purchase date. [7]Sec. 1.1060-1T(e)(1), *490 Temporary Income Tax Regs., 53 Fed. Reg. 27040 (July 18, 1988). Any consideration remaining after the required allocation has been made among all assets is to be allocated to intangible assets in the nature of goodwill and going concern value. Sec. 1.1060-1T(d), Temporary Income Tax Regs., 53 Fed. Reg. 27040 (July 18, 1988).
*491 The parties also do not dispute that, in order to depreciate or amortize the adjusted basis of each of the intangible assets at issue, petitioners must show that each of those assets has a useful life, the duration of which can be ascertained with reasonable accuracy. [8]
The dispute here centers on the *492 fair market values of all of the intangible assets at issue and the useful lives of certain of those assets (viz., the radio broadcast formats). Respondent concedes that each of the intangible assets at issue has an ascertainable fair market value, although that value is less than the value for each such asset advocated by petitioners. [9] See Newark Morning Ledger Co. v. United States, 507 U.S.    , 113 S. Ct. 1670, 1680-1681 (1993). As for the useful lives of the formats, petitioners assert that each of those formats has a useful life, the duration of which can be ascertained with reasonable accuracy. Respondent disagrees. In deciding the issues of fair market value and useful life presented here, we are guided by the following principles. With respect to the concept of fair market value, that term generally is defined as the price which a willing buyer would pay a willing seller, both having *493 reasonable knowledge of relevant facts and neither acting under any compulsion. See United States v. Cartwright, 411 U.S. 546, 551 (1973); Sammons v. Commissioner, 838 F.2d 330, 333 (9th Cir. 1988), affg. in part, revg. in part on another issue T.C. Memo. 1986-318; Kolom v. Commissioner, 644 F.2d 1282, 1288 (9th Cir. 1981), affg. 71 T.C. 235 (1978). The applicable standard is objective, using a hypothetical willing buyer and seller. It is not a personalized standard that focuses on a particular buyer or seller. See Propstra v. United States, 680 F.2d 1248, 1251-1252 (9th Cir. 1982); Kolom v. Commissioner, supra.
The fair market value of property is a question of fact. See Sammons v. Commissioner, supra;Propstra v. United States, supra at 1251. While we must consider all information, we have broad discretion to determine what method of valuation most fairly represents fair market value in light of the facts presented. *494 See Estate of O'Connell v. Commissioner, 640 F.2d 249, 251-252 (9th Cir. 1981), affg. in part, revg. and remanding in part on another issue T.C. Memo. 1978-191. The determination of the fair market value of property is a matter of judgment, rather than of mathematics. See In re Williams' Estate, 256 F.2d 217, 220 (9th Cir. 1958), affg. T.C. Memo. 1956-239. Moreover, since valuation is necessarily an approximation, it is not required that the value we determine be one as to which there is specific evidence, provided it is within the range of figures that properly can be deduced from the record. Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Hamm v. Commissioner, 325 F.2d 934, 939-940 (8th Cir. 1963), affg. T.C. Memo. 1961-347. With respect to the determinable useful life requirement of section 167, the regulations provide: If an intangible asset is known from experience or other factors to be of use in the *495 business * * * for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. * * * An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. * * * [Sec. 1.167(a)-3, Income Tax Regs.]
The estimated useful life of an asset is the period over which it may reasonably be expected to be useful to the taxpayer in his trade or business. Sec. 1.167(a)-1(b), Income Tax Regs. This period is to be determined by reference to the taxpayer's experience with similar property, taking into account present conditions and probable future developments. Id. If the taxpayer's experience is inadequate, the general experience in the industry may be used until the taxpayer's own experience forms an adequate basis for the determination. Id. The estimate of an asset's useful life must be based on the facts known at the close of the taxable year at issue. Banc One Corp. v. Commissioner, 84 T.C. 476, 499 (1985), *496 affd. without published opinion 815 F.2d 75 (6th Cir. 1987). Both parties have relied on the opinions of experts to support their respective views on the fair market value of each of the intangible assets at issue and the useful life of each of the broadcast formats. We evaluate the expert opinion evidence in light of the qualifications of the expert and all other evidence in the record. See Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 508 (1991); Parker v. Commissioner, 86 T.C. 547, 561 (1986). We have broad discretion to evaluate the overall cogency of an expert's analysis. Sammons v. Commissioner, supra at 334. We are not bound by the formulae and opinions proffered by an expert, In re Williams' Estate, supra at 219; Goldstein v. Commissioner, 298 F.2d 562, 567 (9th Cir. 1962), affg. T.C. Memo. 1960-276, especially *497 when they are contrary to our judgment. Orth v. Commissioner, 813 F.2d 837, 842 (7th Cir. 1987), affg. Lio v. Commissioner, 85 T.C. 56 (1985); Estate of Kreis v. Commissioner, 227 F.2d 753, 755 (6th Cir. 1955), affg. T.C. Memo. 1954-139. Instead, we may reach a decision based on our own analysis of all the evidence in the record. See Silverman v. Commissioner, supra at 933; Hamm v. Commissioner, supra at 940. Where experts offer divergent estimates, we shall decide what weight to give those estimates by examining the factors used by the experts to arrive at their conclusions. Casey v. Commissioner, 38 T.C. 357, 381 (1962). The persuasiveness of an expert's conclusion depends largely upon the disclosed facts on which it is based. See Tripp v. Commissioner, 337 F.2d 432, 434 (7th Cir. 1964), affg. T.C. Memo. 1963-244. While we may accept the opinion of an expert in its entirety, Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980), *498 we may be selective in the use of any portion of such an opinion. Parker v. Commissioner, supra at 562. Before turning to our consideration of the fair market value of each of the assets at issue, we restate the Court's view that questions of fair market value, like those presented here, are generally more appropriately resolved through the give and take of settlement negotiations by the parties, rather than adjudication. Buffalo Tool & Die Mfg. Co. v. Commissioner, supra at 451. In the absence of such a resolution with respect to the intangible assets at issue, we are left to decide the fair market values of those assets, as well as the useful lives of the radio broadcast formats. In so doing, we shall decide what weight to give to the conflicting expert opinions proffered by the parties. Before discussing the expert valuations of each of the intangible assets at issue, we shall make certain general observations concerning the parties' experts and their opinions concerning those assets. In support of their position, petitioners offer the report of Miller, Kaplan (petitioners' expert), a firm of certified public *499 accountants that specializes in broadcast industry financial advisory, tax, and auditing services, and the testimony of George N. Rivin (Mr. Rivin), that firm's partner in charge of broadcast services, who prepared that report. Although Mr. Rivin is not an appraiser, he has taken courses in business valuation and has allocated the purchase prices of over 100 radio stations, undertakings which involved determinations of the fair market values and the useful lives of the assets of those radio stations. The approach of petitioners' expert in valuing the intangible assets at issue, albeit consistent with GAAP which does not control for Federal tax purposes, is generally not consistent with the willing buyer-willing seller standard which does control for such purposes. Petitioners' expert seems to be of the view that the values of the intangible assets at issue should be determined with reference only to Henry, and not with reference to hypothetical willing buyers and willing sellers. For instance, petitioners' expert has criticized the opinions of value offered by respondent's expert because they are based on what respondent's expert considered to be discount and tax rates applicable *500 to hypothetical willing buyers. Petitioners' expert thus has ignored a fundamental principle of Federal tax law that governs here, viz., the fair market value standard for Federal tax purposes is objective and is not based on the characteristics of a particular buyer or seller. Propstra v. United States, 680 F.2d at 1251-1252. The allocation of the prices paid for the assets at issue is to be made on the basis of the objective fair market values of those assets as measured by the hypothetical willing buyer-willing seller standard. To the extent that petitioners' expert has not followed this approach in valuing the intangible assets at issue, its opinions are flawed and are not reliable. In support of her position, respondent relies on the expert report of Marshall and Stevens, Inc. (Marshall and Stevens or respondent's expert), a valuation and consulting firm, and the testimony of Melvin I. Fineberg (Mr. Fineberg), an employee of that company who prepared that report. Mr. Fineberg is an accredited senior appraiser of the American Society of Appraisers and has performed 50 to 100 appraisals of intangible assets of radio stations. Respondent's expert *501 report was prepared in accordance with generally accepted appraisal standards. In preparing its report, respondent's expert did not visit any of the stations or discuss their operations with past or present management. Rather, it relied on information provided to it concerning the stations. At trial, Mr. Fineberg admitted that many subjective judgments were made in arriving at the opinions of value contained in the report of Marshall and Stevens. For example, Mr. Fineberg testified that subjective judgments were made in arriving at the appropriate discount rate to use in valuing the various assets at issue. In certain instances, we find that respondent's expert did not adequately explain the bases on which its subjective judgments were made. Consequently, without further explanation, we do not find the opinions of value offered by respondent's expert to be entirely persuasive. This is not to say that an expert should not make subjective judgments in developing an estimate of value. To the contrary, as noted above, the determination of fair market value is a matter of judgment, rather than of mathematics. See In re Williams' Estate, 256 F.2d at 220. *502 However, there can be a range of acceptable values arrived at by making different, yet reasonable, subjective judgments. Thus, to assist the Court, the reasons underlying an expert's subjective judgments should be adequately explained. We shall now discuss in detail each party's expert valuation of the intangible assets that remain at issue in this case. 1. Radio Broadcast Formats
The parties dispute both the useful lives of the formats of the stations acquired by Henry and the fair market values of those formats. If we decide that petitioners have not established with reasonable accuracy the useful lives of the formats, it will be unnecessary to our decision that we determine specific values for the formats. See Forward Communications Corp. v. United States, 221 Ct. Cl. 582, 608 F.2d 485, 497 (1979). We therefore turn first to the question of the useful lives of the broadcast formats in question. Petitioners contend that they determined with reasonable accuracy the useful lives of the formats at issue. In support of their claim, they offer the report of their expert and the testimony of Mr. Rivin. It was Mr. Rivin who *503 developed estimates of the useful lives of those formats. Mr. Rivin testified that he is familiar with the concept of a wasting asset and the various factors that he believes are to be used in determining the useful lives of radio station formats. Mr. Rivin further testified that there is a widely held view in the radio broadcast industry that, due to competition and changes in listening habits, broadcast formats have a certain life over which they will attract listeners and revenue. In determining the useful life of each of the broadcast formats acquired by Henry, Mr. Rivin indicated that he examined, inter alia, historical data concerning formats and trends both in a particular market and the industry as a whole. In this connection, he claimed that he could predict changes in listening habits based on industry reports and publications, although he admitted that doing so is not an exact science. Mr. Rivin claimed to have determined the useful lives of the formats of certain of the stations acquired by Henry (viz., KDON-FM, [10] KFAB, KGOR, KMJ, KNAX, and KFYE) by utilizing a methodology pursuant to which he measured the number of formats used by radio stations in the market served *504 by each of those stations over a 10-to-12-year period and calculated the average life of a format in those markets based on that information. Although respondent does not dispute the accuracy of the information concerning format changes used by petitioners' expert to develop the average format lives it claims to have relied upon, respondent does dispute petitioners' contention that the useful lives of the formats at issue can be determined with reasonable accuracy. In support of her position, respondent relies on the testimony of Mr. Fineberg and the expert report of his employer, Marshall and Stevens. Mr. Fineberg *505 testified that he was familiar with the various factors that he believes are to be used in determining the useful lives of radio station formats. Respondent's expert report states, and Mr. Fineberg testified, that it is not possible to determine accurately the useful lives of radio station formats because unpredictable factors determine their lives, including listening tastes, demographics, advertiser revenues, and the preferences of station owners. [11] Mr. Fineberg also criticized the methodology of petitioners' expert because it considered only formats that changed during the period studied by petitioners' expert and did not examine those formats that did not change. Mr. Fineberg was not persuaded that there was a necessary relationship between the formats that changed and the formats of the stations purchased by Henry. *506 We are not prepared to accept the sweeping contention of respondent's expert that it is impossible to determine with reasonable accuracy the useful life of a radio station format. We nonetheless acknowledge that it might be difficult to take into account the effect of the factors noted by respondent's expert on the determination of that life. Indeed, Mr. Buckley admitted at trial that it is hard to predict how long a radio station format will continue to be useful and that a format sometimes lasts longer than expected. After considering the entire record, we find that petitioners have not established the useful life of any of the formats at issue except the format of KFYE. Petitioners' expert has not persuaded us that the method it purportedly used to determine the average useful life of each format at issue yielded reliable projections of the useful life of each such format. It failed to demonstrate that there was any necessary relationship between the formats of the radio stations in a particular market that changed and the formats of the stations in those markets purchased by Henry. As respondent points out, the formats of certain of the stations purchased by Henry (viz., *507 KDON-FM, KFAB, and KGOR) did not change during the periods apparently studied by petitioners' expert. We do not believe the fact that other stations changed their formats during those periods is necessarily indicative of the time at which Henry's stations would change their formats after Henry acquired them. At trial, witnesses for both parties consistently testified that formats change for a number of reasons, such as changes in listening habits and tastes or the unwillingness of advertisers to purchase air time for commercials on stations broadcasting a particular format. For instance, Mr. Buckley testified that a music format known as "easy listening" had been dropped by the industry because advertisers did not want to reach the audience that listened to it. This suggests that circumstances applicable to a particular format may affect its useful life. Thus, on the instant record, we do not accept the premise of petitioners' expert in determining the useful lives of the formats at issue that the useful life of a particular format is necessarily based on the length of time other types of formats have been broadcast in the same market. It seems possible to us that the changes *508 in formats that occurred during the study period relied on by petitioners' expert could have resulted from circumstances that may not have affected the useful lives of the formats at issue. This is further suggested by the fact that certain of the formats at issue did not change during the period apparently studied by petitioners' expert. Petitioners' expert relied only on the number of format changes occurring during the study period it chose and made no effort to explain how or when changes in audience taste or loss of interest by advertisers would cause the formats of Henry's stations to be changed. It seems to us that the method used by petitioners' expert is overly simplistic and mechanical. Evidently, even petitioners' expert must have concluded that the method it used was not totally reliable in ascertaining with reasonable accuracy the useful lives of the formats at issue. We draw this inference because Miller, Kaplan did not use the useful lives arrived at by using that method in its determination of the fair market values [12] of the formats of KDON-FM, KFAB, and KGOR or for purposes of claiming amortization deductions in respect of those formats in Henry's returns for *509 the years at issue. Under the methodology petitioners' expert claimed to have used, the average life of a format in the Salinas-Monterey, California market that KDON served was determined to be 3.69 years based on the experience of radio stations in that market. However, the useful life of KDON-FM's contemporary hit, or top 40, format was estimated at five years for purposes of calculating the fair market value of that format and in claiming amortization in respect of that format in Henry's *510 1987 and 1988 tax returns. Although the persuasiveness of an expert's opinion rests upon the factors used to arrive at his or her conclusions, Casey v. Commissioner, 38 T.C. at 381, and upon the disclosed facts on which it is based, Tripp v. Commissioner, 337 F.2d at 434, petitioners' expert did not explain why it estimated the useful life of KDON-FM's format at five years when the method it purportedly used to develop that estimate indicated a useful life of 3.69 years. Petitioners have offered no explanation for the discrepancy. Consequently, we will not accept the determination by petitioners' expert of the useful life of the format of KDON-FM. Under the purported methodology of petitioners' expert, the useful life of a format in the Omaha, Nebraska market that KFAB and KGOR served was determined to be seven years. Indeed, petitioners' expert report states that the formats of those stations are subject to amortization over a seven-year period. However, the useful lives of the full service AM format of KFAB and of a so-called adult contemporary [13] format of KGOR were estimated at five years for purposes of valuing *511 those formats and claiming amortization in respect of those formats in Henry's tax returns for the years at issue. Again, neither Mr. Rivin nor anyone else offered an explanation as to why the useful life of each of those formats was five years, rather than seven. Even if the useful lives of those formats were five years, no explanation of the method used to develop those estimates was provided. Consequently, we will not accept the determination by petitioners' expert of the useful lives of the formats of KFAB and KGOR. *512 We are also not prepared to accept the estimates of the useful lives of the formats of KMJ and KNAX, located in Fresno, California, that were determined by petitioners' expert. Petitioners' expert ascertained that the full service AM format of KMJ and the country music format of KNAX had useful lives of seven years. At trial, Mr. Rivin testified that he had developed those useful lives using the same methodology that he had used to determine the useful lives of the other formats and that he had done a study for the formats of KMJ and KNAX, although he admitted that that study was not included in Miller, Kaplan's report. Petitioners' expert did, however, include in its report a study of the average lives of radio broadcast formats in the Fresno, California market in support of its estimate of the useful life of KFYE's adult contemporary format. That study concluded that the average life of a radio broadcast format in that market was five years. [14] Petitioners' expert concluded that the useful life of KFYE's format was five years on the basis of that study. No explanation was offered as to why two studies of the same Fresno, California market (i.e., one for KMJ and KNAX and one *513 for KFYE) purportedly using the same method of analysis yielded two different conclusions with respect to the average format life in the Fresno market (i.e., seven years and five years, respectively). Because the study performed by petitioners' expert with respect to the formats of KMJ and KNAX was not made available to us, we cannot ascertain the reason for the discrepancy between that study and the study performed with respect to the format of KFYE. That discrepancy calls into question the conclusion of petitioners' expert concerning the useful lives of the formats of KMJ and KNAX, and we are therefore unwilling to accept its determination of those lives. In contrast, facts disclosed by the record satisfy us that the adult contemporary format of KFYE in Fresno had a useful life when Henry acquired that station that *514 could be determined with reasonable accuracy. As Mr. Fineberg noted, the preferences of station management are one factor that affects the useful life of a radio station's format. Mr. Buckley testified that KFYE was losing money when Henry purchased it and that Henry acquired it because of the strength of its signal, and not for its format. Henry had sold KNAX at about the time it acquired KFYE. As part of that sale, Henry entered into a covenant not to compete with the buyer of KNAX which stated that Henry agreed not to broadcast country music in Fresno for three years. Mr. Buckley further testified that he permitted the station personnel of KFYE to broadcast whatever they wanted for approximately three years following its purchase until the Henry covenant expired and KFYE could adopt a country music format, which it did as soon as that covenant expired. On the present record, we find that when Henry purchased KFYE, it did not intend to continue using the adult contemporary format of KFYE for more than a limited amount of time (viz., approximately three years) and that that format could have been expected to be useful in Henry's business only for a limited period of time (viz., *515 approximately three years) after it acquired KFYE. We therefore will not disturb the five-year useful life employed by Henry in amortizing the adult contemporary format of KFYE. Having decided in favor of petitioners on that score, we must now determine the fair market value of KFYE's format. Miller, Kaplan estimated the fair market value of the KFYE format to be the present value of the additional revenue (revenue premium) that KFYE could have expected to receive over the useful life of that format in excess of the amount that would have been expected to be received based simply on KFYE's share of the audience. [15] Petitioners' expert based its estimate on information concerning advertising revenue received by radio stations across the country with formats similar to the adult contemporary format of KFYE that Miller, Kaplan compiled and information concerning audience shares of those stations that the rating service Arbitron compiled. Based on that information, petitioners' expert estimated that a station broadcasting an adult contemporary format would deliver a revenue premium of 41 percent. Petitioners' expert found no reason to adjust that percentage in valuing KFYE's format, *516 nor did it consider the expenses or taxes incurred by the station with respect to those revenues. Petitioners' expert discounted that future stream of additional revenue to present value using a discount rate of eight percent. Petitioners' expert also found that KFYE's format was consistently well executed. [16] Petitioners' expert concluded that the fair market value of KFYE's format was $ 826,000. Respondent's expert Marshall and Stevens used a cost approach in order to arrive at the fair market value of KFYE's format. This is because *517 Marshall and Stevens believed that a radio station's format was only one element contributing to a radio station's success, that its impact could not readily be separated from other factors bearing on the success of a station, and that therefore the value of a format should be calculated on the basis of the cost of changing it. Based on its knowledge of the industry, respondent's expert concluded that approximately 10 to 20 percent of a radio station's gross revenues are generally spent to change a format. Respondent's expert estimated that 15 percent of KFYE's gross revenue would have to be spent to change its format. The savings represented by eliminating the cost of changing KFYE's format at the time it was acquired were then converted to an after-tax value using a 40-percent tax rate. Because respondent's expert concluded that formats do not have reasonably ascertainable useful lives and therefore cannot be amortized, it did not take into account any tax savings resulting from amortization in valuing the KFYE format, as it did with respect to other assets that it conceded had limited lives. Under its approach, Marshall and Stevens valued KFYE's format at $ 121,000. On the *518 present record, it seems to us that the approach used by petitioners' expert was not appropriate for estimating the value of KFYE's format. At the time Henry acquired KFYE, it was losing money and its format was not successful. Mr. Buckley testified that, at the time Henry purchased KFYE, station personnel were playing whatever music they wanted to play and that he continued to allow them do that for several years thereafter. It thus seems to us that a hypothetical willing buyer would not have expected KFYE's format to generate the revenue premium that petitioners' expert found typical of stations broadcasting an adult contemporary format. The methodology of petitioners' expert in valuing KFYE's format is further flawed in that it did not consider expenses and taxes that could have been expected to be incurred with respect to projected revenues. Moreover, in discounting the projected cost savings, petitioners' expert used eight percent, an artificially low discount rate. Contrary to Mr. Rivin's testimony and as he ultimately admitted at trial, that rate did not represent either Henry's cost of capital at the time of the acquisition or the rate appropriate for a company with *519 Henry's characteristics. The eight-percent discount rate used by petitioners' expert represented Henry's cost of capital prior to the acquisitions of the stations involved here. The cost of capital used to fund the acquisitions was 10 to 12 percent. Petitioners' expert did not claim that the eight-percent discount rate that it used represented the cost of capital of a hypothetical willing buyer, the proper standard to use in selecting the appropriate discount rate. Petitioners' expert maintained that the proper discount rate to use in valuing the intangible assets at issue was Henry's cost of capital, and it criticized respondent's expert for its use of industry rates of return in valuing those assets. We disagree. Under section 1060, purchase price allocations generally are to be made on the basis of the fair market value of the assets acquired. Sec. 1.1060-1T(d)(2), 53 Fed. Reg. 27040 (July 18, 1988). As noted above, it is generally accepted that the fair market value standard is objective and is not based on the characteristics of a particular buyer or seller. Propstra v. United States, 680 F.2d at 1251-1252. Consequently, *520 while the purchase prices Henry paid for the stations may have been influenced by circumstances unique to Henry or the sellers, the allocation of the amounts paid for the stations is to be made on the basis of the objective fair market values of the assets acquired as measured by the hypothetical willing buyer-willing seller standard. Accordingly, in valuing the intangible assets at issue in this case, market rates of return for similar types of assets that were prevalent at the time of the acquisitions should be used, rather than the cost of capital of a particular buyer. We also note that the opinion of Miller, Kaplan that KFYE's format was well executed appears to be inaccurate given Mr. Buckley's testimony that station personnel were allowed to play whatever music they wanted to air. On the instant record, we do not accept the fair market value for KFYE's format estimated by petitioners' expert. Nor do we accept the fair market value for the KFYE format that respondent's expert determined. Respondent's expert used a 40-percent tax rate in its calculation of the after-tax value of the cost avoided by not changing KFYE's format. Although respondent's expert indicated that *521 this figure incorporated Federal, State, and local tax rates and that it was assumed to be the "normal" tax rate of investors in general, no explanation was provided concerning the manner in which the 40-percent tax rate was developed. For instance, we do not know whether, in developing that rate, respondent's expert used the income tax rate of a particular State and locality or the average rate of all States and localities. Without further explanation of the method by which respondent's expert arrived at the 40-percent tax rate, we are unwilling to accept it. Moreover, in valuing the KFYE format, respondent's expert did not take into account the benefit of the reduction in a buyer's taxes resulting from amortizing that format because it did not believe that the KFYE format had an ascertainable useful life and it therefore concluded that it could not be amortized. We have found that KFYE's format had a determinable useful life when Henry purchased it. Consequently, as respondent's expert recognized in the case of other assets at issue for which it acknowledged there were determinable useful lives, the determination of the fair market value of the KFYE adult contemporary format *522 should take the amortization benefit into account. It is also noteworthy that respondent's expert did not adequately explain why it assumed that 15 percent of revenue would have to be spent to change the format of KFYE, as opposed to the 20 percent it found appropriate for certain other formats it valued. Although respondent's expert noted that the percentage spent would be influenced by factors such as the size of and competitive situation in a radio station's market, it did not attempt to explain how those factors influenced its selection of the percentage used in its analysis. In addition, Mr. Fineberg admitted, and Mr. Buckley testified, that if a format is changed, advertising revenues may be curtailed or eliminated for a period of time. It seems, however, that, in estimating the cost of a format change, respondent's expert considered only what a radio station would have to spend to change its format and did not consider the potential loss of advertising revenues that would occur as a result of such a change. Mr. Buckley testified that it generally cost $ 500,000 to change a station's format considering both the costs of change and lost advertising revenues. On the instant *523 record, we do not accept the fair market value for KFYE's format estimated by either party's expert. We are left to determine that value based on all the evidence in the record and using our best judgment. We conclude that the fair market value of the adult contemporary format at the time Henry purchased KFYE was $ 300,000. 2. Studio and Transmitter Leases
Among the assets at issue are leases of space for the transmitters and antennas of KFYE and KGOR and the lease for studio space used by KFAB and KGOR. Both parties' experts developed values for those leases. Petitioners' expert generally determined that the value of each lease equaled the present value of the cost savings Henry would realize over its useful life by not having to lease other facilities at what petitioners' expert considered market rental rates. Respondent's expert used that approach to value the KFAB and KGOR studio lease, but it disagreed with certain assumptions used by petitioners' expert in applying that approach. Respondent's expert found no bargain element associated with the KFYE and KGOR transmitter leases. It valued the KFYE transmitter lease on the basis of the additional revenue attributable *524 to the fact that that lease allowed the station's signal to reach a larger potential audience than its competitors. It valued the KGOR transmitter lease based on the avoided cost of relocating KGOR's transmitter and antenna equipment to another site. We shall discuss in more detail the expert valuations of each lease at issue. a. Transmitter Leases
i. KFYE Transmitter Lease
The assets of KFYE acquired by Henry included a lease that was originally entered into on November 8, 1979, and that was modified on March 15, 1985, for space for the antenna and transmitter used to broadcast KFYE's signal. The lease permitted Henry to transmit KFYE's signal from a television broadcast tower. The parties agree that the useful life of the KFYE transmitter lease is 16 years. While a copy of the lease in effect on the date the assets of KFYE were purchased is not in the record, the parties' experts agree on the amounts of rent that are payable under that lease until its expiration on November 7, 2004. Miller, Kaplan valued the KFYE transmitter lease on the basis of the bargain element of that lease, calculated as the present value of the difference between the payments called for *525 under the lease and the amount that it considered to represent the fair rental value of the leasehold. Petitioners' expert set forth what it determined to be the value of competitive transmitter sites and then increased that value to reflect the fact that the KFYE transmitter lease allowed the station to position its antenna at a greater height than those of its competitors, which permitted its signal to reach a greater number of potential listeners. Petitioners' expert did not explain how it arrived at either the value of the competitive transmitter sites or the amount of the premium attributable to the superiority of KFYE's transmitter site. Miller, Kaplan discounted the projected stream of savings yielded by the KFYE transmitter lease using the eight-percent discount rate that represented Henry's cost of capital prior to the acquisitions of the stations at issue. Petitioners' expert valued the bargain element of the KFYE transmitter lease at $ 1,072,449. Respondent's expert Marshall and Stevens found that the rental payments called for under the KFYE transmitter lease represented market rental rates. Respondent's expert noted that television stations commonly rent space on *526 their broadcast towers as an accommodation to radio stations for relatively modest amounts that represent the market value of those leases. Respondent's expert recognized the superiority of the site afforded KFYE by its transmitter lease and valued the KFYE transmitter lease on the basis of the additional revenue that it estimated the station could earn by virtue of being able to reach more potential listeners. Respondent's expert opined that a maximum of 10 percent of estimated station revenues, or $ 134,400, was attributable to that factor. Although KFYE was losing money in the most recent fiscal year prior to Henry's purchase of that station, Marshall and Stevens estimated that, based on the average pretax operating margin of similar stations, a 20-percent pretax margin, or $ 26,880, could have been expected for each year the lease continued in effect from the additional revenue it calculated was attributable to the superiority of the KFYE transmitter site. Respondent's expert discounted that stream of additional pretax income to $ 140,000, using a discount rate of 18 percent. According to Marshall and Stevens, the 18-percent discount rate represented the rate of return expected *527 by investors in radio stations at the time Henry acquired KFYE in order to compensate them for the perceived levels of risk in their investments. After taking into account the combined effect of Federal, State, and local income taxes (viz., a 40-percent tax rate) and the tax savings generated by amortizing the KFYE transmitter lease, respondent's expert concluded that its fair market value was $ 105,000. On the present record, we do not accept petitioners' contention that the bargain element of the KFYE transmitter lease is as great as their expert concluded, especially given that the lease was modified in March 1985, about three and a half years before Henry acquired the transmitter lease and other assets of KFYE. Miller, Kaplan did not explain how it arrived at the fair rental value of the leasehold or why the rent payable under that lease was so far below that purported value. It appears to us, as it did to respondent's expert, that it was unreasonable for Miller, Kaplan to assume that the rent payable under the KFYE transmitter lease was so far below fair rental value. In this connection, respondent's expert indicated that many transmitter leases provided for rents similar *528 to the rent charged under the KFYE transmitter lease. We also point out that, as discussed above, petitioners' expert used an improper discount rate of eight percent to arrive at the present value of the purported bargain value of the KFYE transmitter lease and it ignored the effect of income taxes on that value. Any bargain element of the KFYE transmitter lease should have been calculated so as to reflect the projected amount by which Henry's income from KFYE would not have been reduced by additional costs for a transmitter lease at a market rate of rent. On the instant record, we do not find the estimate by petitioners' expert of the fair market value of the KFYE transmitter lease to be reliable. Nonetheless, we are not prepared to accept the valuation by respondent's expert of the KFYE transmitter lease. Mr. Fineberg, who prepared the report on behalf of respondent's expert, admitted during his testimony that the estimate by Marshall and Stevens of the amount of additional revenue attributable to the advantages afforded KFYE by its transmitter lease was subjective. He did not adequately explain how Marshall and Stevens arrived at that estimate of additional revenue, and we *529 therefore are not willing to rely on it. We also are not persuaded on the instant record as to the reliability of the method used by respondent's expert to calculate the rate used to discount the future stream of income expected from the KFYE transmitter lease. Marshall and Stevens' determination of the discount rate prevailing at the time Henry pruchased KFYE entailed a multistep process of ascertaining, inter alia, a weighted average cost of capital that it believed was typical of the radio industry at that time. Marshall and Stevens arrived at that cost of capital by, inter alia, determining the rates of return that it concluded were expected on debt and equity of companies it considered comparable to Henry and that it weighted according to the relative proportion of debt and equity it considered those companies to have. Marshall and Stevens utilized the BAA corporate bond rate as the appropriate rate of return on debt. Using the capital asset pricing model, a widely utilized mathematical model for estimating a firm's cost of equity capital, respondent's expert calculated the rate of return on equity as equal to the rate of return on risk-free investments plus the product *530 of the equity risk premium expected on small company stocks and the beta factor it considered appropriate for companies owning radio stations. The beta factor, a measure of the systematic risk inherent in the stock of the company being analyzed, gauges the volatility of a company's stock price in relation to the volatility in the stock market. In developing the discount rate it used in valuing the KFYE transmitter lease (as well as certain other assets at issue), respondent's expert admitted that a number of subjective judgments were made, such as the appropriate beta factor. Respondent's expert assumed that the beta factor associated with privately owned radio stations is best measured by those of publicly traded companies owning radio stations. Respondent's expert also made assumptions concerning the relative proportion of debt and equity comprising the capital structure of a hypothetical buyer. Marshall and Stevens calculated what it believed was the rate of return on equity of small companies (i.e., 22 percent) and what it believed was the cost of debt for such companies (i.e., 10.59 percent). It multiplied each such rate by what it estimated was the typical proportion of *531 equity to debt comprising the capital structure of a company with radio holdings. Respondent's expert concluded that such a capital structure would consist of two-thirds equity and one-third debt. Marshall and Stevens did not explain how that conclusion was justified, although it stated in its report that the proportion of capital represented by debt of the companies it studied ranged from 26.9 percent to 91.4 percent, with five of those companies reporting long-term debt as a percentage of total capital of between 26.9 percent and 43.7 percent. Without further explanation by respondent's expert and in view of that statement in its report, it seems to us that Marshall and Stevens may have used a smaller proportion of debt in its formula than the industry figures relied on by it seem to suggest was appropriate. Any understatement of the proportion of debt in a capital structure would result in an overstatement of the discount rate, since an excessive proportion of that capital structure would be composed of equity for which a higher rate of return is expected. On the instant record, we question the reliability of the discount rate employed by respondent's expert in valuing the *532 KFYE transmitter lease. Respondent's expert also took into account the benefits of amortizing the KFYE transmitter lease that it conceded had an ascertainable useful life. Marshall and Stevens did so by using a formula (tax formula) which incorporated an assumed 40-percent tax rate and which attempted to convert the pretax value of the projected additional revenue that it had determined was attributable to the KFYE transmitter lease to an after-tax value. As discussed above, we do not accept the 40-percent assumed tax rate, since respondent's expert did not adequately explain the method by which it was developed. The tax formula employed by Marshall and Stevens also incorporated (1) a discount rate that it considered to be the appropriate rate of return on the projected revenue attributable to the KFYE transmitter lease and that, for the reasons discussed above, we have questioned and (2) a discount rate that it believed reflected the expected tax benefits resulting from amortization of that lease (tax discount rate). Respondent's expert concluded that the tax discount rate should be four percentage points less than the discount rate it used for the projected additional revenue *533 attributable to the KFYE transmitter lease. In addition to questioning the discount rate determined by Marshall and Stevens for the projected revenue attributable to the KFYE lease, we have concerns about the tax discount rate used by respondent's expert, since it was based on that discount rate and since Marshall and Stevens did not explain why it believed that a four-percent reduction of the discount rate it otherwise determined would produce an appropriate tax discount rate. On the instant record, we do not accept the opinion of either party's expert with respect to the fair market value of the KFYE transmitter lease. We are left to determine that value based on the entire record and using our best judgment. We conclude that the fair market value of the KFYE transmitter lease at the time Henry acquired that station was $ 350,000. ii. KGOR Transmitter Lease
At the time Henry acquired substantially all of the assets of KGOR, Henry negotiated with the seller of that station to lease space for the antenna and transmitter used by KGOR to broadcast its signal. The parties agree that the useful life of the KGOR transmitter lease is 20 years. Under that lease, Henry was permitted *534 to broadcast KGOR's signal from an antenna situated on a television tower in Omaha, Nebraska. A monthly rental of $ 100 was payable during the first 10 years of that lease. The KGOR transmitter lease could be extended, at the lessee's option, for a second 10-year term at a monthly rental of $ 200. Petitioners' expert concluded that inherent in the KGOR transmitter lease was a bargain element attributable to the savings Henry obtained by leasing the transmitter at less than what it claimed was the market rental rate for such a lease. Miller, Kaplan concluded that the market rental value of the KGOR transmitter lease was $ 6,000 per month. According to petitioners' expert, this conclusion was based on an offer that had been made as consideration for a lessee to relinquish its rights to lease the site for a transmitter. Petitioners' expert believed that the market rental rate would increase by 5.5 percent per year over the life of the KGOR transmitter lease. Petitioners' expert discounted the projected stream of savings to present value using a discount rate of eight percent. It arrived at a fair market value for the KGOR transmitter lease of $ 1,063,745. Respondent's expert *535 found no bargain element in the KGOR transmitter lease. It concluded that the fair market value of that lease was limited to the avoided cost of moving the transmitter to a new site, that is to say, that lease saved Henry the cost of having to relocate the station's transmitter. Respondent's expert noted that, in the absence of contradictory data, it must be assumed that the rental rate provided under the KGOR transmitter lease, which was negotiated at the time Henry acquired substantially all the assets of KGOR, represented the fair rental value of the transmitter site. In this connection, Marshall and Stevens again noted that it was common for television stations to lease space on their towers to radio stations for minimal amounts. Respondent's expert estimated the cost of securing a new site and of moving and installing equipment at approximately $ 70,000. These pretax cost savings were reduced to $ 51,000 to reflect their after-tax value, including the value of the amortization deductions for the KGOR transmitter lease. On the instant record, we conclude that petitioners have not established that the fair market value of the KGOR transmitter lease is the amount determined *536 by their expert. Petitioners' expert based its estimate of that value on an offer for relinquishment of site lease rights. However, the circumstances under which that offer was made do not appear in the record. Thus, we do not know, inter alia, whether or not it was made by a party acting under compulsion. Furthermore, petitioners' expert did not perform any market surveys in arriving at the value of the KGOR transmitter lease. Miller, Kaplan also ignored the effect of taxes in estimating that value. We generally agree with respondent's expert about the flaws in the manner in which petitioners' expert estimated the fair market value of the KGOR transmitter lease. In particular, we agree with the observation of Marshall and Stevens in its rebuttal report that it is unreasonable to assume that the rent payable under the KGOR transmitter lease was so far below the purported market rent used by petitioners' expert, especially since that lease was negotiated at the time Henry acquired the station. There is no reliable evidence in the record to suggest that the KGOR transmitter lease afforded Henry a transmitter site at a rent below the market rent prevailing at the time Henry acquired *537 KGOR. In an effort to bolster the conclusion of petitioners' expert as to the fair market value of that lease, Mr. Rivin claimed at trial that KGOR's transmitter site was valuable because it was in a favorable location that dominated the Omaha market. However, we do not see any reason why that value would not have been reflected in the rent provided under the KGOR transmitter lease. On the instant record, we do not find any bargain element of value with respect to the KGOR transmitter lease, and we do not accept the estimate by Miller, Kaplan of the fair market value of that lease. We agree with respondent's expert Marshall and Stevens that the KGOR transmitter lease allowed Henry to avoid the cost of securing an alternate transmitter site and of moving equipment. While we find no evidence in the record that contradicts respondent's expert estimate of the cost of moving the KGOR transmitter, [17] for the reasons discussed above, we question the 40-percent tax rate used to calculate the after-tax value of those cost savings and the other aspects of the tax formula used to estimate the present value of the tax benefits afforded a buyer over the useful life of the lease. On the *538 instant record, we do not accept Marshall and Stevens' estimate of the value of the KGOR transmitter lease. Based on the present record, we do not accept the opinion of either party's expert with respect to the fair market value of the KGOR transmitter lease. We are left to determine that value based on the entire record and using our best judgment. We conclude that the fair market value of the KGOR transmitter lease at the time Henry acquired that station was $ 60,000. b. KFAB and KGOR Studio Lease
The assets of KFAB and KGOR acquired by Henry included a lease for space used as the studios for those stations. The parties agree that the useful life of the studio lease for amortization purposes is 12.33 years. The lease term had begun on April 1, 1979, and was to end on March 31, 1989. The monthly rent payable under the studio lease was $ 1,800. It was renewable at the option of the lessee for a five-year *539 term from April 1, 1989 to April 1, 1994, at a monthly rent of $ 2,100 and for a second five-year term from April 1, 1994 to April 1, 1999, at the same rent. Petitioners' expert valued the studio lease on the basis of the savings Henry stood to achieve by continuing to rent the space governed by that lease, rather than by renting another property at a fair market rental. Respondent's expert agrees with that approach. However, it disagrees with certain assumptions made by petitioners' expert in calculating those cost savings. Both experts treated the studio lease as covering 9,000 square feet of space for valuation purposes. Petitioners' expert concluded that comparable space would have cost $ .90 per square foot in 1986, the year Henry acquired those stations, and that market rents would rise at a rate of 5.5 percent per year, which petitioners' expert termed a "rental inflation index". Petitioners' expert projected a stream of cost savings based on those assumptions, discounted it to present value using a discount rate of eight percent, and concluded that the value of the studio lease was $ 899,555. Based on information in its files and discussions with knowledgeable appraisers *540 in Omaha, respondent's expert concluded that comparable space would cost $ .50 per square foot per month. Apparently using hindsight, respondent's expert found that there was no increase in rental rates from 1986 to 1993, and it did not take any into account in valuing the studio lease. However, respondent's expert noted that, in 1986, the increase projected by petitioners' expert would not have been unreasonable. Therefore, instead of applying the discount rate it considered appropriate for calculating the present value of the cost savings afforded by the studio lease (viz., 17 percent), [18] it applied a discount rate of 11.5 percent to take account of the effect of the expected increase in market rental rates. Respondent's expert then calculated the after-tax value of those avoided costs and concluded that the value of the studio lease was $ 150,000. *541 Based on the instant record, we are not persuaded that either party's expert accurately valued the studio lease. It appears that both parties' experts obtained their information concerning the rental value of space that they considered comparable to KFAB's and KGOR's studios from essentially the same source, viz., persons familiar with the Omaha real estate market. Petitioners suggest that their expert's information concerning the cost of comparable space is more reliable than that of respondent's expert since petitioners' expert obtained the comparable cost information soon after Henry acquired the stations of KFAB and KGOR. We disagree. Comparable cost data are not necessarily more or less reliable merely because of the time at which they are collected. Respondent's expert, in its rebuttal report, stated that the rental rate used by petitioners' expert represented the cost of space in newer and more modern space than was occupied under the studio lease, suggesting that the rental rate used by petitioners' expert was greater than the market rental rate for space similar to that used by KFAB and KGOR. Respondent's expert also pointed out that petitioners' expert failed to consider *542 the effect of income taxes on the value of that lease. In addition, for the reasons discussed above, petitioners' expert used an artificially low eight-percent discount rate to calculate the present value of the estimated savings yielded by that lease. On the instant record, we do not accept petitioners' expert valuation of the studio lease. Nor do we accept respondent's expert valuation of the studio lease. We note initially that respondent's expert indicated that since it received a copy of the studio lease only a short time before its report was due, its valuation should be considered more like an analysis of the potential benefits of that lease to Henry, rather than a full appraisal of the property rented. Moreover, in deciding whether to project increases in the market rates of rent, it appears that respondent's expert relied at least in part on hindsight, having determined after the fact that rents did not increase for the period 1986 through 1993. Fair market value must be determined on the basis of conditions and facts as they exist on the valuation date, without regard to hindsight, Estate of Gilford v. Commissioner, 88 T.C. 38, 52 (1987), *543 although subsequent events may be considered for the limited purpose of establishing the reasonableness of expectations on the valuation date, id. at 52-53. Indeed, respondent's expert report stated that, in 1986, it would not have been unreasonable to project rent increases in the amounts assumed by petitioners' expert. It is noteworthy that respondent's expert purported to take the effect of expected future rent increases into account in a manner which we consider improper. Instead of taking those expected increases into account by projecting increases in market rates of rent, respondent's expert attempted to take them into account by lowering the discount rate used to calculate the present value of the cost savings. The discount rate, as respondent's expert states in its report, is the amount of return needed to compensate an investor for the perceived levels of risk in a particular investment. Thus, the proper level of that rate is analytically separate from the amount of increase in market rates of rent reasonably to be expected over the term of the studio lease. Respondent's expert did not explain how expectations of future increases in market *544 rental rates would cause a hypothetical buyer to accept a lower rate of return on an investment in the studio lease. Nor did it explain how it concluded that the reduction of the discount rate selected by it produced the amount required to reflect accurately the effect of expected future market rent increases. Without further explanation in the record, it seems to us that the adjustment by respondent's expert of the discount rate to reflect the effect of expected future rent increases on the value of the studio lease was speculative. Furthermore, as noted above, respondent's expert has not adequately explained the tax rate and tax discount rate incorporated in its formula for calculating the after-tax value of the cost savings afforded by the studio lease. On the instant record, we are not willing to accept the determination by respondent's expert of the fair market value of the studio lease. Based on the present record, we do not accept the opinion of either party's expert with respect to the fair market value of the KFAB and KGOR studio lease. We are left to determine that value based on the entire record and using our best judgment. We conclude that the fair market value *545 of the studio lease at the time Henry purchased KFAB and KGOR was $ 450,000. 3. Covenants Not to Compete
Petitioners contend that they are entitled to amortize the claimed bases of the two covenants not to compete Henry entered into when it purchased the assets of KDON-AM and KDON-FM from Grace and the assets of KMJ and KNAX from McClatchy. The parties agree that the useful life of each of those covenants is three years. They disagree on the value and thus the adjusted basis to be allocated to each covenant. Petitioners claim that $ 2 million should be allocated to the Grace covenant and $ 1,906,550 should be allocated to the McClatchy covenant -- the respective amounts they assert that Henry paid for each covenant. Respondent claims that the value of the Grace covenant is $ 194,000 and that the value of the McClatchy covenant is zero because FCC regulations prevented McClatchy from operating a radio station that could compete with Henry in the area served by KMJ and KNAX. Covenants not to compete are intangible capital assets, the cost of which is may be amortized over their useful lives. See Peterson Machine Tool, Inc. v. Commissioner, 79 T.C. 72, 80 (1982), *546 affd. 54 AFTR2d 84-5407, 84-2 USTC par. 9885 (10th Cir. 1984); sec. 1.167(a)-3, Income Tax Regs. We may go beyond the formal dealings of the parties to see if the form reflects the substance of those dealings. See Yandell v. United States, 315 F.2d 141, 142 (9th Cir. 1963); Annabelle Candy Co. v. Commissioner, 314 F.2d 1, 5 (9th Cir. 1962), affg. T.C. Memo. 1961-170. The fact that a taxpayer has allocated a specific amount to a covenant not to compete is not controlling for tax purposes. Lemery v. Commissioner, 52 T.C. 367, 375 (1969), affd. per curiam 451 F.2d 173 (9th Cir. 1971). In order for the form in which the parties have cast their transaction to be respected for tax purposes, the covenant not to compete must have some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement. Schulz v. Commissioner, 294 F.2d 52, 55 (9th Cir. 1961), *547 affg. 34 T.C. 235 (1960). This test is commonly referred to as the "economic reality" test. See Patterson v. Commissioner, 810 F.2d 562, 571 (6th Cir. 1987), affg. T.C. Memo. 1985-53. An allocation to a covenant not to compete lacks economic reality where there is no showing that the seller would experience a loss comparable to the amount supposedly paid for the covenant such that it would bargain for substitute compensation in that amount or that the buyer would lose such an amount were the seller to compete against it. See Forward Communications Corp. v. United States, 221 Ct. Cl. 582, 608 F.2d at 493-494. Before turning to the parties' contentions as to each of the covenants at issue, we shall make certain observations applicable to both. [19] The only evidence offered by petitioners to support their contentions with respect to the amounts paid for the Grace and McClatchy covenants were the covenants themselves and Mr. Buckley's testimony. We found Mr. Buckley's testimony with respect to those covenants to be in large part general and conclusory. *548 In these circumstances, we are not required to, and do not, accept Mr. Buckley's self-serving testimony. See Geiger v. Commissioner, 440 F.2d 688, 689-690 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-159; Wood v. Commissioner, 338 F.2d 602, 605 (9th Cir. 1964), affg. 41 T.C. 593 (1964); Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). *549 Petitioners did not present the testimony of any representative of Grace or McClatchy to confirm Mr. Buckley's testimony and did not offer any explanation for not doing so. We may therefore presume that that testimony would not have been favorable to petitioners' position. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). We also note that petitioners' expert did not determine or in any way opine on the values of the covenants not to compete. Rather, it was Mr. Buckley who determined the consideration to be paid for each covenant during the course of negotiating the purchases of KDON-AM and KDON-FM from Grace and of KMJ and KNAX from McClatchy. Petitioners' expert report makes no mention of the amount claimed to have been paid for the Grace covenant and accepts the amount that Mr. Buckley claimed to have paid for the McClatchy covenant. With the foregoing in mind, we will discuss each covenant separately. a. Grace Covenant
Mr. Buckley testified that, of the $ 3 million total purchase price Henry paid Grace for KDON, $ 2 million was paid for the Grace *550 covenant. He claims that this amount was paid for the covenant because Grace had been quite successful in the past in the Salinas market and he did not want Henry to have to compete against Grace in that market. He did not offer any explanation for the amount claimed to have been paid for that covenant other than to say that that was what it took to keep Grace out of the market. Respondent contends that petitioners have not satisfied the economic reality test with respect to the amount claimed to have been paid for the Grace covenant. Respondent's expert Marshall and Stevens pointed out that, based on information provided to it, operating profits of KDON-AM and KDON-FM over the three-year life of that covenant were projected to equal only $ 1,465,000. It therefore concluded that it was unreasonable to assume that a buyer would have paid more for Grace's covenant not to compete than the projected operating profits for those radio stations over the same period of time during which the covenant was to be in effect. Respondent's expert valued the Grace covenant based on its estimate of the likely loss of operating profits Henry would have suffered had the Grace covenant not been *551 in effect. It concluded that, while Grace could have competed against Henry if the Grace covenant had not been in effect during the three years following Henry's purchase of KDON, the effect of such competition would have been minimal because of the significant time required either to acquire another station or to obtain an FCC license for a new station and because any such station would represent, at best, only incremental competition for Henry. Respondent's expert thus estimated that competition from Grace could have been expected to reduce the revenues of KDON-AM and KDON-FM by 10 percent for each of the three years following Henry's acquisition of those stations. Starting with estimates of revenues and expenses prepared by KDON's management, respondent's expert prepared cash flow projections for KDON with and without the effect of competition from Grace and determined the present value of operating profit under both scenarios by using a 17-percent discount rate. The present value of the additional operating profit projected in the absence of competition from Grace was then reduced pursuant to the tax formula of respondent's expert in order to reflect the effect of taxes on *552 that additional income. Respondent's expert concluded that the fair market value of the Grace covenant at the time Henry acquired KDON was $ 194,000. We are unable to accept the position of either party. Standing alone, Mr. Buckley's general, conclusory, and self-serving assertions are insufficient to carry petitioners' burden of proof. Moreover, the amount claimed by Henry for the Grace covenant exceeds the amount of income KDON was projected to produce during the term of the covenant. Petitioners have not shown that the projections are not accurate. Therefore, the amount claimed by petitioners for the Grace Covenant does not comport with economic reality. On the instant record, we reject petitioners' position that Henry paid Grace $ 2 million in exchange for its covenant not to compete with Henry in the Salinas market for three years after Henry purchased KDON. Nor do we accept the value assigned to the Grace covenant by respondent's expert. As respondent's expert conceded, Grace had the means to compete successfully with Henry in the Salinas market. We do not agree with Marshall and Stevens that the effect of that potential competition was as minimal as it concluded. *553 Having previously operated KDON, Grace would have been familiar with the Salinas market and could have been expected to become an effective competitor of Henry sooner than a new entrant into that market who did not have such experience. We also note that respondent's expert did not attempt to quantify the length of time that Grace would have needed to replace KDON. Mr. Buckley testified that acquisition of a radio station requires approximately four to five months, including the time needed to obtain the approval of the FCC for the transaction. Even assuming that some additional time would have been needed to identify and purchase an existing station in the market in which KDON operated if one were not otherwise being offered for sale, it does not seem unreasonable to assume that Grace could have become Henry's competitor within a year of the sale of KDON. Respondent's expert Marshall and Stevens assumed a uniform reduction in operating profit of 10 percent for each of the three years following the purchase by Henry of KDON and the execution of the Grace covenant. It did not explain why that figure was selected or why it would not change over time. It appears to us that the adverse *554 effect of competition from Grace might have been less in the first year because of the delays Grace would have experienced in reentering the Salinas market and greater in the later years once it had reentered that market. Once it reentered the Salinas market, an experienced firm such as Grace potentially could have offered Henry greater competition than the other radio station operators in that market. It is also noteworthy that, in discounting its projections of operating profit, respondent's expert calculated a discount rate which, for the reasons stated above, we are unable to accept. Nor are we persuaded, for the reasons discussed above, that we may rely on the tax formula used by Marshall and Stevens to calculate the effect of amortization on the value of the Grace covenant. On the instant record, we do not accept the opinion of either party's expert with respect to the fair market value of the Grace covenant. We are left to determine that value based on the entire record and using our best judgment. We conclude that the fair market value of the Grace covenant at the time Henry acquired KDON was $ 500,000. b. McClatchy Covenant
Mr. Buckley testified that Henry would *555 not have purchased KMJ and KNAX without obtaining McClatchy's agreement not to compete against it in Fresno. According to Mr. Buckley, this is because, as a media conglomerate with newspapers and radio and television stations, McClatchy would have been a powerful competitor of Henry. He also testified that McClatchy informed him when he purchased those stations that it intended to leave the communications business except for newspapers. Respondent contends that, under the cross-ownership rules of the FCC, McClatchy could not have obtained a license for a radio station in Fresno after selling KMJ and KNAX because it also owned, operated, or controlled a daily newspaper in that city. 47 C.F.R. sec. 73.3555(c) (1988). The sale of those stations terminated a cross-ownership arrangement that had been allowed by the FCC pursuant to certain grandfathering rules it had promulgated. Mr. Buckley admitted at trial that it would have been very difficult for McClatchy to have competed against Henry without a radio station license from the FCC. He also admitted that no one could purchase a radio station without FCC approval. However, he claimed that he did not believe he could have relied *556 on the FCC to prevent McClatchy from competing against Henry in Fresno had it decided to do so and that he believed he needed to obtain a covenant not to compete from McClatchy in order to prevent this from occurring. Under the economic reality test of Schulz v. Commissioner, 294 F.2d at 55, petitioners have failed to show that the McClatchy covenant had any value greater than zero. [20] Reasonable persons, genuinely concerned with their economic future, would not have bargained for the McClatchy covenant, given that McClatchy advised Mr. Buckley at the time Henry was negotiating the purchase of KMJ and KNAX that it intended to divest itself of its broadcasting properties. See Forward Communications Corp. v. United States, 221 Ct. Cl. 582, 608 F.2d at 492; Schulz v. Commissioner, supra at 54. Under the regulations of the FCC, once McClatchy sold its radio stations and as long as McClatchy owned a newspaper in Fresno, it was thereafter prohibited from obtaining a license to operate a radio station in that city. *557 We have difficulty in accepting the testimony of Mr. Buckley, a successful businessman who has extensive experience in the radio broadcast industry, that he believed that, under the circumstances extant at the time Henry purchased KMJ and KNAX, McClatchy could have reentered the Fresno radio broadcasting market as Henry's competitor. Such a reentry would have necessitated either FCC approval, which petitioners have not shown McClatchy would have been able to obtain, or a complete reversal of McClatchy's stated plans of divesting itself of all of its communications businesses except newspapers. There is nothing in the record to suggest that McClatchy planned to divest itself of its Fresno newspaper. Indeed, the record discloses the contrary. Moreover, it seems to us that, in the course of negotiating a covenant not to compete, a reasonable purchaser of KMJ and KNAX would have investigated any possible limitations on McClatchy's ability to resume radio broadcasting in Fresno, such as the FCC's cross-ownership rules. We find it difficult to believe that Mr. Buckley would not have consulted his advisers concerning the effect of the FCC's cross-ownership rules on McClatchy's ability *558 to compete against Henry. Under these circumstances, we are not required to, and we do not, accept Mr. Buckley's self-serving testimony. See Geiger v. Commissioner, 440 F.2d at 689-690; Wood v. Commissioner, 338 F.2d at 605; Tokarski v. Commissioner, 87 T.C. at 77. On the instant record, we find that the fair market value of the McClatchy covenant at the time Henry acquired KMJ and KNAX was zero. 4. Additions to Tax for Negligence
Respondent determined that petitioners are liable for the additions to tax for negligence and that petitioners' entire underpayment for each of the years at issue was attributable to negligence or disregard of rules or regulations. On brief, respondent limits her argument concerning the additions to tax for negligence to the underpayment for each of those years resulting from the amounts of amortization deductions claimed with respect to the intangible assets still at issue. Section 6653(a)(1)(A) and section 6653(a)(1), for 1987 and 1988, respectively, impose an addition to tax equal to five percent of the underpayment of tax if any part of that underpayment *559 is due to negligence or disregard of rules or regulations. Section 6653(a)(1)(B) for 1987 imposes an addition to tax equal to 50 percent of the interest due on the portion of the underpayment attributable to negligence. Respondent does not argue that petitioners' underpayment of income tax for each of the years at issue was attributable to disregard of rules or regulations. Consequently, we will decide only whether each such underpayment was attributable to negligence. For purposes of section 6653(a)(1), the term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of the tax laws. Negligence also has been defined as a lack of due care or failure to do what a reasonable person would do under the circumstances. Leuhsler v. Commissioner, 963 F.2d 907, 910 (6th Cir. 1992), affg. T.C. Memo. 1991-179; Allen v. Commissioner, 925 F.2d 348, 353 (9th Cir. 1991), affg. 92 T.C. 1 (1989); Skeen v. Commissioner, 864 F.2d 93, 96 (9th Cir. 1989), affg. Patin v. Commissioner, 88 T.C. 1086 (1987); *560 Neely v. Commissioner, 85 T.C. 934, 947-948 (1985). Petitioners argue that they relied on the accounting firm of Miller, Kaplan to allocate the purchase prices of the stations in question among the intangible assets of those stations and to determine the useful lives of those intangible assets. [21] They argue that, therefore, any underpayment for each of the years at issue attributable to the amortization deductions claimed with respect to those assets was not the result of negligence. Respondent argues that petitioners did not rely on Henry's accountants to determine the amount allocable to the Grace and McClatchy covenants and that petitioners' reliance on the allocations and useful lives determined by Henry's accountants was unreasonable. We agree with respondent that petitioners were negligent with respect to the underpayment for each year at issue attributable to the Grace and McClatchy covenants. We agree with petitioners that their reliance on Henry's accountants with respect to the remaining items still at issue was reasonable. *561 The duty to file an accurate return generally cannot be avoided by placing responsibility on an agent. Pritchett v. Commissioner, 63 T.C. 149, 174 (1974); Leroy Jewelry Co. v. Commissioner, 36 T.C. 443, 445 (1961). Simply hiring an accountant will not necessarily protect a taxpayer from the addition to tax for negligence. See Allen v. Commissioner, supra at 353-354; Collins v. Commissioner, 857 F.2d 1383, 1386 (9th Cir. 1988), affg. Dister v. Commissioner, T.C. Memo. 1987-217. Nonetheless, it is well established that a taxpayer may avoid the addition to tax for negligence by showing reasonable reliance on the advice of a professional or expert. Ewing v. Commissioner, 91 T.C. 396, 423-424 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991); Industrial Valley Bank & Trust Co. v. Commissioner, 66 T.C. 272, 283 (1976); *562 see also Collins v. Commissioner, supra.
In the case of claimed reliance on an accountant who prepared the taxpayer's return, the taxpayer must establish that the correct information was provided to the accountant and that the item incorrectly claimed or reported in the return was the result of the accountant's error. Ma-Tran Corp. v. Commissioner, 70 T.C. 158, 173 (1978); Enoch v. Commissioner, 57 T.C. 781, 803 (1972); see also Collins v. Commissioner, supra. However, a taxpayer may bear responsibility for any negligent errors on the part of his or her agent. American Properties, Inc. v. Commissioner, 28 T.C. 1100, 1117 (1957), affd. per curiam 262 F.2d 150 (9th Cir. 1958). Here, petitioners cannot claim reliance on Henry's accountants with respect to the underpayment for each of the years at issue resulting from the incorrect allocation of consideration and adjusted basis to each of the two covenants at issue. Mr. Buckley, and not Henry's accountants, arrived at the amount that would be *563 claimed as having been paid for each of those covenants. Petitioners offered only Mr. Buckley's self-serving testimony and the covenants themselves to establish the propriety of the amounts claimed. Those amounts substantially exceeded the amounts that we have sustained on the present record. Although petitioners assert generally that they exercised due care by having Henry's returns and their returns professionally prepared, they cannot delegate the responsibility for ensuring the accuracy of those returns to Henry's agents and their agents insofar as the covenants at issue are concerned, especially when the errors in the returns relating to those covenants resulted from incorrect information supplied by them to the return preparers. See Ma-Tran Corp. v. Commissioner, supra; Pritchett v. Commissioner, supra; Enoch v. Commissioner, supra.
With respect to the underpayment for each of the years at issue attributable to the amortization deductions claimed with respect to the remaining intangible assets still at issue, we find that petitioners reasonably relied on their accountants *564 to determine the appropriate allocation of purchase price to, and, in the case of the broadcast formats, the useful life of, each of those assets. Mr. Buckley and Henry's employees provided Miller, Kaplan with information concerning the assets of the stations purchased, including the prices paid and the purchase agreements. Mr. Rivin and that firm had extensive experience in the radio broadcasting industry and used methods acceptable under GAAP that were common in the industry to allocate the purchase prices of the stations among the intangible assets acquired. Miller, Kaplan relied on the large amount of data concerning the radio broadcast industry compiled by it to value the formats and gathered information concerning market rental rates to value the studio lease and the KFYE and KGOR transmitter leases. Although, as discussed above, we have not accepted all the purchase price allocations and estimates of useful life determined by petitioners' expert, which served as Henry's accounting firm with respect to the transactions at issue, based on the entire record, we find that that expert's conclusions with respect to the intangible assets at issue were not unreasonable. On the *565 instant record, we find that neither petitioners nor their expert was negligent with respect to the amortization deductions claimed in respect of the assets at issue other than the Grace and McClatchy covenants not to compete. [22] We conclude that any underpayment for 1987 or 1988 attributable to the amortization deductions claimed with respect to the intangible assets at issue except the two covenants is not attributable to negligence. 5. Addition to Tax for a Valuation Overstatement
Respondent determined that the addition to tax for a valuation overstatement is applicable *566 for each of the years at issue with respect to the overvaluations of various intangible assets obtained by Henry when it acquired the stations at issue. On brief, respondent limits her argument concerning the applicability of the addition to tax for a valuation overstatement to the underpayment for each such year attributable to the overvaluations of the intangible assets still at issue. [23]
*567 Section 6659(a) provides that, where an underpayment of income tax is attributable to a valuation overstatement, there is to be added to the tax an amount equal to the applicable percentage of the underpayment so attributed. [24] This addition to tax does not apply if the value or adjusted basis claimed in the return is less than 150 percent of the correct valuation or adjusted basis, as the case may be, or if the underpayment attributable to the overvaluation is less than $ 1,000. Sec. 6659(c) and (d). Respondent may waive the addition to tax for a valuation overstatement if the taxpayer shows that there was a reasonable basis for the valuation or adjusted basis claimed in the return and that the claim was made in good faith. Sec. 6659(e). The Court reviews this determination only for abuse of discretion. Krause v. Commissioner, 99 T.C. 132, 179 (1992), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994). *568 Petitioners contend that they did not overvalue the intangible assets at issue and that they acted in good faith by having Henry hire experienced accountants to prepare its tax returns and to allocate the purchase price paid by Henry for each station to the various intangible assets acquired in each purchase. We have determined herein the values for the intangible assets at issue other than those for the formats of KDON-FM, KGOR, KMJ, KFAB, and KNAX. To the extent that the provisions of section 6659 are satisfied, the addition to tax thereunder will apply to the underpayment for each of the years at issue attributable to the overstatements of the values or adjusted bases of those assets for which we have determined values unless we find that respondent has abused her discretion in failing to waive the addition to tax. [25]
*569 On the instant record, we find that respondent did not abuse her discretion with respect to the underpayment for each of the years at issue attributable to the overvaluations or claims of adjusted bases in excess of the amounts we have found to be the appropriate values of the Grace and McClatchy covenants not to compete. Petitioners did not rely on experts to determine the values of those covenants. Mr. Buckley decided the amount that would be claimed as the amount paid for the Grace and McClatchy covenants, and no accountants were involved in that decision. Petitioners' expert report does not contain any stated value for the Grace covenant and simply restates the amount purportedly agreed to by Henry and McClatchy for the McClatchy covenant. Accordingly, petitioners cannot claim reliance on experts with respect to the underpayment for each year at issue attributable to the excessive values claimed for the Grace and McClatchy covenants. We therefore sustain respondent's determination that petitioners are liable for the addition to tax for a valuation overstatement with respect to the underpayment for each such year attributable to such excessive values. With respect to the *570 remaining intangible assets still at issue in respect of which we have made determinations as to value and which contribute to the underpayment for each year at issue, we must decide whether respondent abused her discretion in failing to waive the addition to tax under section 6659. The standard provided under section 6659(e) for waiver of the addition to tax is the same in all material respects as that provided under section 6661(c). In that connection, we note that the United States Court of Appeals for the Ninth Circuit, the normal venue for appeal in the instant case, held that, where a taxpayer's reliance on an adviser was "reasonable" and "in good faith under all the circumstances", the Commissioner should waive the addition to tax under section 6661. Vorsheck v. Commissioner, 933 F.2d 757, 759 (9th Cir. 1991), affg. in part and revg. in part per curiam an Oral Opinion of this Court. Based on the entire record, we find that petitioners' reliance on Miller, Kaplan in claiming values, adjusted bases, and useful lives for the assets at issue was reasonable and that they acted in good faith. Miller, Kaplan was experienced in the radio broadcasting *571 industry and used methods of determining the purchase price allocations and estimated useful lives that were common in the broadcasting industry and that were consistent with GAAP. Miller, Kaplan also drew on its extensive collection of data concerning the radio broadcast industry and gathered other information to aid in developing those allocations. That firm obtained information from Mr. Buckley and Henry's employees concerning the acquisition of the stations and consulted with Mr. Buckley concerning the purchase price allocations and useful lives set forth in petitioners' expert report. Although the Vorsheck case involved section 6661, and not section 6659, we conclude that it is controlling here and that we are bound to follow it. Golsen v. Commissioner, 54 T.C. 742, 756-757 (1970), affd. on another issue 445 F.2d 985 (10th Cir. 1971). Accordingly, we will not sustain respondent's determination of the addition to tax for a valuation overstatement with respect to the underpayment for each year at issue attributable to the values and adjusted bases of those assets still at issue (other than the Grace and McClatchy *572 covenants) that were claimed by Henry and by petitioners in their returns. Vorscheck v. Commissioner, supra.
6. Addition to Tax for a Substantial Understatement of Income Tax
Respondent determined in the alternative that, in the event her determination with respect to the addition to tax for a valuation overstatement were not sustained, the addition to tax for a substantial understatement of income tax should apply for each of the years at issue to petitioners' underpayment attributable to the overvalued intangible assets at issue for each of those years. We have sustained application of the addition to tax for a valuation overstatement with respect to the underpayment for each year at issue attributable to the claimed values of the Grace and McClatchy covenants. We have not sustained the application of that addition to the underpayment for each of those years resulting from the overvaluation of the remaining intangible assets at issue which were valued by petitioners' expert and as to which we made determinations of value. Consequently, we shall consider the applicability of the addition to tax for a substantial understatement of income tax attributable to the *573 underpayment for each year at issue only with respect to the amortization deductions claimed for those assets. Section 6661, in general, imposes an addition to tax in the amount of 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. An understatement is generally defined as the amount by which the taxpayer's correct tax exceeds the reported tax. Sec. 6661(b)(2). In the case of individuals, an understatement is substantial if it exceeds the greater of 10 percent of the correct tax or $ 5,000. Sec. 6661(b)(1)(A). An understatement is to be reduced by that portion that is attributable to either (1) the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment, or (2) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return. Sec. 6661(b)(2)(B). Respondent may waive all or a portion of the addition to tax under section 6661 upon a showing that there was reasonable cause for the understatement and that the taxpayer acted in good faith. Sec. 6661(c). Petitioners contend that there *574 was substantial authority for the allocation of purchase price to the intangible assets at issue and for the useful lives determined and that the relevant facts affecting the tax treatment of those intangible assets were adequately disclosed. Respondent disputes both those claims. We need not, however, resolve that dispute. This is because we have concluded that, except for the Grace and McClatchy covenants, petitioners reasonably relied on Miller, Kaplan to make the allocations of purchase price among the intangible assets at issue and to estimate the useful lives of those assets and that petitioners acted in good faith. Thus, the decision of the Court of Appeals for the Ninth Circuit in Vorsheck v. Commissioner, supra, requires us to find that respondent should have waived the addition to tax for a substantial understatement of income tax. Accordingly, we do not sustain respondent's alternative determination with respect to that addition to tax. 7. Increased Interest under Section 6621(c)
In the notice of deficiency, respondent determined that the entire underpayment for each of the years at issue is to bear interest at the increased *575 rate provided under section 6621(c). On brief, respondent seeks the increased rate of interest only with respect to the underpayment attributable to the claimed valuations or adjusted bases of the intangible assets still at issue at 150 percent or more of their correct values. Section 6621(c) provides that the interest payable on a substantial underpayment attributable to tax-motivated transactions is to be computed at 120 percent of the rate otherwise applicable. [26] The term "substantial underpayment attributable to tax motivated transactions" means any underpayment of income tax in excess of $ 1,000 attributable to one or more tax-motivated transactions. Sec. 6621(c)(2). Section 6621(c)(3)(A) defines the term "tax motivated transaction" to mean, inter alia, any valuation overstatement as defined in section 6659(c), any loss disallowed by reason of section 465(a), and any sham or fraudulent transaction. As discussed above, section 6659(c) defines a valuation overstatement as the claim in any return of a value or adjusted basis for any property that is 150 percent or more of the amount determined to be the correct valuation or adjusted basis of that property. *576 Petitioners contend that they did not engage in any tax-motivated transactions. Rather, Henry, an S corporation of which Mr. Buckley was the sole shareholder, purchased the assets of certain ongoing businesses, allocated the purchase prices of those businesses among the assets acquired, and claimed depreciation deductions allowable under section 167. Petitioners also contend that the assets at issue here were not overvalued and that the adjusted bases claimed for those assets were not excessive. However, we have found the values and the adjusted bases of the intangible assets at issue to be less than those reported by Henry. To the extent the values and adjusted bases claimed are 150 percent or more of the values or bases we have found, we sustain the application of the increased rate of interest under section 6621(c) to the underpayment for each year at issue attributable to any such valuation overstatement. To reflect the foregoing and the concessions of the parties, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. A number of issues were settled by agreement of the parties. Respondent represents on brief that other issues (viz., those relating to the amount of ordinary income includible in petitioners' income for 1988 under sec. 1245, the amounts of deductions for charitable contributions for the years at issue, and the amount of any net operating loss for 1988), which are not argued by either party, involve mechanical computations that depend on the resolution of other issues. We direct the parties to take those so-called mechanical issues into account as part of the Rule 155 computation.↩
3. A radio station's format is the type of programming the station chooses to broadcast. There are over 20 types of formats recognized in the radio broadcast industry.↩
4. At trial, Mr. Buckley testified that KGOR's format at the time of the purchase was top 40. Petitioners' expert report identified KGOR's format as "adult contemporary". According to that report, music broadcast in the adult contemporary format is lighter than that of the top 40 format. No explanation has been offered for this discrepancy, and we accept Mr. Buckley's testimony.↩
5. 47 C.F.R. sec. 73.3555(c) (1988)↩.
6. Although the temporary regulations under sec. 1060 were promulgated on July 18, 1988, they are generally effective with respect to any asset acquisition occurring after May 6, 1986, and thus are applicable in this case. Sec. 1.1060-1T(a)(2), Temporary Income Tax Regs., 53 Fed. Reg. 27039↩ (July 18, 1988).
7. Sec. 1.167(a)-5, Income Tax Regs., provides that, in the case of the acquisition of a combination of depreciable and nondepreciable property for a lump sum, the basis for depreciation cannot exceed an amount which bears the same proportion to the lump sum as the value of the depreciable property at the time of the acquisition bears to the value of the entire property at that time. Sec. 1.167(a)-5T, Temporary Income Tax Regs., 53 Fed. Reg. 27043 (July 18, 1988), effective July 18, 1988, provides that, in the case of an acquisition of depreciable and nondepreciable property for a lump sum to which sec. 1060 applies, the basis for depreciation of the depreciable property cannot exceed the amount of consideration allocated to that property under sec. 1060 and sec. 1.1060-1T, Temporary Income Tax Regs., 53 Fed. Reg. 27039 (July 18, 1988). Sec. 1.167(a)-5T, Temporary Income Tax Regs., supra↩, applies only to Henry's acquisition of substantially all of the assets of KFYE.
8. Petitioners seem to contend that the question whether the intangible assets at issue are part of the goodwill of the stations acquired by Henry is before the Court. Respondent, however, does not argue that petitioners must show that the intangible assets at issue are separate and distinct from goodwill before they may amortize the adjusted bases of those intangible assets. In any event, by establishing the values of those assets and that they have a limited useful life, petitioners would satisfy the requirement that the intangible assets at issue be separate and distinct from goodwill. Newark Morning Ledger Co. v. United States, 507 U.S.    ↩, 113 S. Ct. 1670, 1680-1681 (1993).
9. Respondent contends that the value of the McClatchy covenant not to compete is zero.↩
10. Petitioners' expert report notes, and Mr. Rivin acknowledged at trial, that KDON-AM broadcast an "oldies" format at the time Henry acquired KDON, while KDON-FM broadcast a contemporary hit, or top 40, format. However, no analysis concerning the useful life or value of the format of KDON-AM appears in either petitioners' or respondent's expert reports, and we shall not consider those matters further.↩
11. Mr. Fineberg further testified that, in all the intangible asset appraisals of radio stations he has performed, he had never before attempted to value a format because its useful life could not be accurately estimated, it therefore could not be amortized, and, consequently, there was no need to make a determination of value.↩
12. Petitioners' expert valued each format by estimating the present value of the amount of additional advertising revenue it believed a station broadcasting such a format could have expected in excess of the prorata share of advertising revenues for that station's market that corresponded to its share of the market's audience. Petitioners' expert developed that estimate of value based on data concerning radio station advertising revenue compiled by Miller, Kaplan and data on audience shares compiled by Arbitron, a rating service.↩
13. We note that, based on Mr. Buckley's testimony, we have found that KGOR broadcast a contemporary hit, or top 40, format at the time Henry purchased it, rather than an adult contemporary format as referred to by petitioners' expert. However, it does not appear that the type of format broadcast by a station affected the estimate by Miller, Kaplan of the format's useful life because that estimate is based on the number of changes of all types of formats occurring within a particular market during a specified time period.↩
14. In the study done with respect to KFYE, the actual average life of formats for Fresno radio station was 5.5 years, but petitioners' expert concluded that the average format life was five years.↩
15. Miller, Kaplan used the same methodology to estimate the fair market values of the other formats at issue. We need not reach those values, since, on the present record, we have found that those formats did not have determinable useful lives when Henry acquired them.↩
16. As we understand it, a format is well executed in the view of petitioners' expert where the selection and rotation of music played and the promotion of the station by on-air personalities are done well.↩
17. Indeed, Mr. Rivin testified that it was not difficult to change a radio station transmitter site.↩
18. For the reasons discussed above, we do not necessarily accept a 17-percent rate as otherwise appropriate for discounting the expected cost savings yielded by the studio lease.↩
19. Respondent argues with respect to both covenants that Henry had an incentive to claim that a large amount was paid for each of the covenants because if that claim were sustained, such amounts would be amortizable over the useful lives of those covenants. Respondent further asserts that Grace and McClatchy had no incentive to minimize the amounts claimed by Henry for the covenants because of the repeal of the preferential tax rate for net capital gain. Prior to that repeal, the grantor of a covenant not to compete had an incentive to minimize the amount paid for such a covenant because payments received in exchange therefor constituted ordinary income to the grantor, while the amount realized from the sale of other business assets might qualify for the preferential tax rate applied to net capital gain. See Schulz v. Commissioner, 294 F.2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 235 (1960). Respondent's argument is not well taken with respect to the Grace covenant which was entered into in 1986 as part of the purchase of the assets of KDON-AM and KDON-FM. The repeal of the preferential rate of tax for the net capital gain of a corporation took effect with respect to capital gains properly taken into account after Dec. 31, 1986. Tax Reform Act of 1986, Pub. L. 99-514, secs. 311(c), (d)(1), 100 Stat. 2219-2220. Thus, Grace would not necessarily have been indifferent to the amount of consideration allocated to the covenant between Henry and itself. Respondent's argument appears more applicable to the McClatchy covenant because it was entered into as part of the purchase of the assets of KMJ and KNAX during 1987. It seems that Henry would have had an incentive to attribute as much of the consideration paid for McClatchy's stations as possible to the covenant not to compete and that McClatchy would not have had an incentive to minimize that allocation. Nonetheless, we do not find this circumstance, standing alone, determinative of the value of the McClatchy covenant.↩
20. Moreover, under the objective standard of fair market value applied to determine the adjusted basis of a covenant not to compete for purposes of making purchase price allocations under sec. 1060 (viz., a willing buyer and willing seller, both having reasonable knowledge of relevant facts and neither acting under compulsion, United States v. Cartwright, 411 U.S. 546, 551 (1973)), it does not seem that the McClatchy covenant has any value given the record here. See sec. 1.1060-1T(c)(2), Temporary Income Tax Regs., 53 Fed. Reg. 27040↩ (July 18, 1988).
21. We note that Miller, Kaplan prepared Henry's returns and allocated the consideration paid by Henry for the stations among their assets and that petitioners employed Johnson, Levie to prepare their individual tax returns for the years at issue. However, respondent does not argue, and there is nothing to suggest, that, in preparing petitioners' returns for the years at issue as they related to Mr. Buckley's ownership in Henry, an S corporation, Johnson, Levie could not reasonably have relied upon the returns of Henry that were prepared by Miller, Kaplan.↩
22. Relying on Vesper v. Commissioner, T.C. Memo. 1989-358↩, respondent argues that imposition of the additions to tax for negligence is warranted notwithstanding petitioners' reliance on the allocations prepared by Miller, Kaplan. We find that case distinguishable because the taxpayer therein did not show that reliance on his appraiser was reasonable, while we find that petitioners have done so in this case.
23. We have decided above that, except for KFYE's format, petitioners may not amortize the formats of the stations acquired by Henry because they have failed to estimate with reasonable accuracy the useful lives of those formats. This ground for disallowing those amortization deductions is separate from the question of the correct values or adjusted bases of those formats, and we have not attempted even to decide those values or adjusted bases except with respect to KFYE. Accordingly, the underpayments resulting from the deductions for amortization claimed with respect to the formats other than KFYE, which we address below, are not attributable to a valuation overstatement. Consequently, the addition to tax provided under sec. 6659(a) does not apply to those underpayments. Gainer v. Commissioner, 893 F.2d 225, 227-229 (9th Cir. 1990), affg. T.C. Memo. 1988-416; Todd v. Commissioner, 89 T.C. 912, 920-922 (1987), affd. 862 F.2d 540↩ (5th Cir. 1988).
24. The applicable percentage varies directly with the size of the overvaluation, ranging from 10 to 30 percent.↩
25. We infer that petitioners requested waivers of the addition to tax under sec. 6659 given that, through the course of this litigation, they have attempted to establish that they acted reasonably and in good faith. See Mailman v. Commissioner, 91 T.C. 1079, 1084↩ (1988).
26. The increased interest provision was repealed prospectively for returns due (without regard to extensions) after Dec. 31, 1989. Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, sec. 7721(b), (d), 103 Stat. 2399, 2400. Accordingly, it is still applicable to the underpayments at issue in this case.↩